# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| NICOLAS CAROSIELLO, | CASE NO. 4:20-CV-02272 |
| Petitioner, | DISTRICT JUDGE BRIDGET MEEHAN BRENNAN |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| WARDEN LaSHANN EPPINGER | **REPORT AND RECOMMENDATION** |
| Respondent. | |

Petitioner Nicolas Carosiello ("Mr. Carosiello" or "Petitioner") brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  (ECF Doc. 1 ("Petition").)  Mr. Carosiello filed his Petition on September 30, 2020.[1]  (*Id*. at p. 12.)   His Petition relates to his convictions for aggravated murder, three counts of tampering with evidence, three firearm specifications, and possession of marijuana in Columbiana County Common Pleas Court Case No. 13 CR 190 following a jury trial.  (ECF Doc. 1; ECF Doc. 7-1, p. 95.)  The case is briefed and ripe for disposition.  (ECF Docs. 7, 17, 18.)

This matter was reassigned to the undersigned Magistrate Judge on October 1, 2021 pursuant to General Order 2021-15.  For the reasons set forth in further detail herein, the

---

[1] "Under the mailbox rule, a habeas petition is deemed filed when the prisoner gives the petition to prison officials for filing in the federal courts." *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) (citing *Houston v. Lack*, 487 U.S. 266, 273 (1988)). The Petition was docketed on October 8, 2020.  (ECF Doc. 1.)

1

undersigned recommends that the Court: (1) **DENY** Ground One; (2) **DENY** Ground Two; and (3) **DISMISS** or **DENY** Grounds Three and Four.

## I.      Factual Background

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. *Id.*; *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

The Seventh District Ohio Court of Appeals summarized the facts underlying Mr. Carosiello's convictions and sentence as set forth below. Mr. Carosiello challenges multiple factual determinations made by the state court of appeals, asserting that there is clear and convincing evidence to rebut the presumption of correctness as to those determinations. (ECF Doc. 17-1, pp. 12-21.) The challenged determinations are underlined below and his argument that those determinations are not entitled to a presumption of correctness is addressed more fully in Section III.C., *infra.* Mr. Carosiello also contends that the court of appeals' determination of the facts in light of the evidence was unreasonable under 28 U.S.C. § 2254(d)(2). (*Id.* at pp. 12-13.) The undersigned addresses that argument in Section III.D., *infra*, in connection with his sufficiency of the evidence claim in Ground One.

The Seventh District factual findings are as follows:

{¶ 2} <u>Appellant is a known drug dealer who kept large amounts of marijuana and cash inside his residence, which is located in Wellsville. (12/29/15 Trial Tr., pp. 726, 892, 965.)</u> On August 11, 2011, four people intended to break into his house to steal his drugs and money. *Id.* at pp. 733, 896, 967. <u>This group of would-be thieves consisted of Holly Carosiello (the victim and Appellant's estranged wife), Jamie Adkins (Holly's brother), Jordan Gainer (Holly's cousin), and Johnny Paroda (Holly's cousin). *Id.* at pp. 896–899, 767.</u> However, when they arrived at Appellant's house, they saw people inside and left.

{¶ 3} The next morning, the group initiated a second attempt to break into Appellant's house. *Id.* at pp. 734. This time Holly was absent and the group was joined by Raymont Bryant, Tonya Sinkbeil and her niece. Jordan knocked on Appellant's back door and entered the house. *Id.* at p. 1214. On opening the door, he encountered Appellant's mother and a large aggressive dog. Jordan identified himself as a friend of Appellant and asked if he was home. When Appellant's mother angrily ordered him out of the house, he left.

{¶ 4} Appellant's mother called him to tell him that someone had entered their house looking for him. Appellant phoned several acquaintances in an attempt to identify this person. <u>Around 4:00 p.m., Johnny called Appellant and told him that Jamie, Jordan, and Raymont had been to his house to steal his drugs and money, and that they would be back.</u> He did not tell Appellant that he was involved.

{¶ 5} Appellant asked Johnny to find out when the thieves planned to return. *Id.* at p. 906. Meanwhile, Appellant called his brother, Tony Carosiello, and his friend, Brian Specht, and asked them to come to the house. *Id.* at p. 742. Brian brought his girlfriend. Appellant's girlfriend, Martina Michael, was also present. <u>Appellant hid his money and moved his drugs deep into a barn on the property. He moved all the cars to a field behind the house. *Id.* at pp. 742, 1094, 1355.</u> Appellant's goal was to create the appearance that the house was empty. <u>Appellant and his friends then concealed themselves in the field behind the house and waited for the thieves to arrive. *Id.* at pp. 743, 864.</u> Appellant, who was armed with a rifle and a handgun, maintained contact with Johnny. *Id.* at pp. 749, 864, 907–909, 1279–1280. Appellant's mother and stepfather waited inside the house. The stepfather was armed with a gun.

{¶ 6} <u>Appellant instructed Johnny to tell Jamie that he would be out of the house for a few hours and that his mother and stepfather were out of town for a funeral.</u> Johnny continually updated Appellant as to whether and when the thieves would arrive. <u>At some point, Appellant believed that they were not coming, and his friends left.</u> Appellant went inside to watch television with Martina, his mother, and his stepfather.

{¶ 7} Around 9:30 p.m., Johnny called Appellant and told him that the thieves were on their way to the house after all. Appellant told Martina to call Tony and instruct him to stay away from the house, because he knew the thieves would not return if they saw Tony. *Id.* at p. 752. Tony told Appellant that a red Sunfire he believed to be Holly's, and carrying a group of people, passed his car. *Id.* at pp. 753, 1035–1036, 1098. Appellant also texted Brian and told him not to come to the house. Brian texted in reply: "[k]ill those m* * * f* * *ers." *Id.* at p. 871.

{¶ 8} Holly drove past Appellant's house and the thieves determined that the house appeared empty. This group now included Holly, her boyfriend Josh Rudder, Jamie, and Dustin Green. Jamie texted Johnny to ensure that no one was home and Johnny

3

swore that the house was empty. *Id.* at p. 978. Josh stayed in the car and drove off, leaving Holly, Jamie, and Dustin at the house. Dustin stayed on one side of the house as a lookout. Jamie knocked on the back door. <u>When no one answered, Jamie unsuccessfully tried to kick down the door. *Id.* at p. 980.</u> When his efforts failed, he and Holly decided to lift her to Appellant's window, which was above the back door, so that she could climb inside the house. Jamie attempted to push in an air conditioner unit that was sitting in the window. *Id.* at p. 983. At first, he was met with resistance. Then, suddenly, the unit slid smoothly inside the house. <u>While this was occurring, Appellant was waiting in his room, armed with a .22 caliber pistol. *Id.* at p. 1294.</u>

{¶ 9} Once the air conditioner was out of the way, Jamie lifted Holly to the window. *Id.* at p. 984. She had managed to climb partially inside when Appellant fired his gun. <u>The shot hit Holly between her eyes.</u> Jamie saw a flash as Holly fell out of the window and landed on a cement staircase that led to the basement. Appellant then leaned out of his window, firing his gun several times and yelling, "[y]ou robbed the wrong house." *Id.* <u>Jamie tried to get to Holly, but when he saw the back door open, he and Dustin fled as Appellant fired into the backyard.</u> Shortly thereafter, Martina went outside and heard Appellant say, "[o]h, my God, I shot Holly." *Id.* at p. 756.

{¶ 10} Martina called Tony and told him, "I think [Appellant] just shot Holly." *Id.* at p. 1100. Shortly thereafter, Tony arrived with his girlfriend Roxanne Lucas and a friend, Michael Johnston. When they arrived, Martina was crying and said, "Holly is dead." *Id.* at p. 1064. <u>Roxanne, who is a nurse, checked Holly and told Appellant to call 911, because she thought she felt a faint pulse. Id. at p. 1066.</u> Appellant told his family, "[y]ou can't tell them I shot her. Don't tell them I shot her." *Id.* at p. 761. He also tried to convince his mother and Martina to tell the police that they shot Holly. <u>Appellant was apparently prohibited from being in possession of a gun due to a previous criminal conviction. Shortly thereafter, Tony left, and Appellant and his stepfather began hiding the drugs and putting their guns away. At some point, Appellant's stepfather did call 911.</u>

{¶ 11} The first responder to arrive was Officer Scott Angelo of the Ohio Department of Natural Resources. *Id.* at p. 453. He heard the call on his radio and offered to assist at the scene. He testified that Appellant and his stepfather were outside and Appellant's mother and Martina were inside the house when he arrived. He asked Martina and Appellant's mother to exit the house, since he was under the impression that an intruder may have been inside. Deputy Kevin Shulas was the next to arrive at the scene. Both Officer Angelo and Dep. Shulas testified that Appellant seemed calm and collected and that no one in the family told them that there had been a shooting. *Id.* at pp. 488, 539.

{¶ 12} Appellant initially told investigators that he had heard no gunshots during the encounter. Ultimately, he made four statements to investigators which he later admitted were untruthful. In these statements, he claimed that he saw a man in the

4

house and he assumed that man killed Holly. However, several witnesses came forward and implicated Appellant in the shooting. One of these witnesses was his girlfriend. Sometime later, Appellant's attorney convinced him to give a truthful statement. While he admitted to Det. Allan Young that he shot Holly, he claimed to have wildly fired his shot at a "shadow."

{¶ 13} Appellant was charged with one count of aggravated murder, an unspecified felony in violation of R.C. 2903.01(A), three counts of tampering with evidence, a felony of the third degree in violation of R.C. 2921.12(A)(1), one count of possession of drugs in violation of R.C. 2925.11(A), and three attendant firearm specifications.

{¶ 14} At trial, the state theorized that Appellant lured the would-be thieves to enter the house on the premise that it was empty, with the intent to ambush them once inside. In response, Appellant claimed that he acted in self-defense in accordance with the "castle doctrine." The jury found Appellant guilty on all counts. However, the jury found that the state had not offered adequate proof as to the amount of drugs in Appellant's possession, and his conviction for possession of drugs was reduced to a minor misdemeanor.

*State v. Carosiello*, 2017-Ohio-8160, 2017 WL 4548327, at *1-3 (Ohio App. Ct. Oct. 5, 2017);

(ECF Doc. 7-1, pp. 95-100) (emphasis added).

## II.     Procedural Background

### A.     State Court Conviction

On July 24, 2013, a Columbiana County Grand Jury indicted Mr. Carosiello on: one count of aggravated murder with a firearm specification; three counts of tampering with evidence, with two counts having firearm specifications; and one count of possession of drugs (marijuana).  (ECF Doc. 7-1, pp. 5-6, 10-19.)  Mr. Carosiello pleaded not guilty and the case proceeded to a jury trial on March 30, 2015.  (*Id*. at pp. 9, 20-24.)  Before opening statements, the jurors went on a jury view with the Bailiff and counsel.  (*Id*. at p. 20.)  Mr. Carosiello waived his right to attend the jury view.  (*Id*.)  When the State rested its case on April 6, 2015, Mr. Carosiello moved for acquittal pursuant to Ohio Crim. R. 29.  (*Id*. at p. 22.)  Mr. Carosiello's motion was denied, and he proceeded with his case-in-chief, which included testifying in his own

defense.  (*Id*. at p. 22; ECF Doc. 7-7, pp. 67-117; ECF Doc. 7-8, pp. 5-170.)  The trial court

denied Mr. Carosiello's renewed Ohio Crim. R. 29 motion for acquittal.  (ECF Doc. 7-1, p. 22.)

The jury received its instructions and began deliberations on April 7, 2015.  (*Id*.; ECF Doc. 7-9,

pp. 107-50.)  The jury returned its verdict that same day, finding Mr. Carosiello guilty of all

counts, except, as to the drug possession charge, the jury found that the State did not prove

beyond a reasonable doubt that the amount of drugs equaled or exceeded one thousand grams but

was less than five thousand grams.  (ECF Doc. 7-1, pp. 10-19, 22-23.)

The trial court sentenced Mr. Carosiello on April 10, 2015.  (ECF Doc. 7-1, pp. 25-28.)

When imposing Mr. Carosiello's sentence, the trial court stated:

> After a lengthy jury trial the Defendant was found guilty of numerous serious
> crimes, including killing another: Holly Carosiello. The Defendant was in his own
> home at the time of the offense, but the evidence of prior calculation and design is
> overwhelming. The Defendant engaged in a comprehensive plan to set up the
> killing and to then carry it out. An integral part of the plan included causing others
> to believe that the Defendant's house was empty because they would not enter an
> occupied house. Holly Cariosello was lead to believe she was entering an empty
> house. In fact the Defendant was armed and waiting inside. Ultimately Holly
> Cariosello was shot one time through the forehead literally right between her eyes.
> This fact contradicts the Defendant's version of the events. After the events the
> Defendant repeatedly lied about his involvement. The Defendant has shown no
> genuine remorse.
>
> A significant prison sentence in this case is most consistent with the purpose and
> principles of sentencing of punishing the Defendant, protecting the public from
> future crimes, and not demeaning the seriousness of the Defendant's conduct and
> its impact upon the victim.

(ECF Doc. 7-1, p. 26.)  The trial court sentenced Mr. Carosiello to life in prison without parole

for aggravated murder and fourteen years on the tampering with evidence counts and firearm

specifications.  (*Id*. at pp. 26-27.)  Mr. Carosiello was sentenced to a minor misdemeanor on the

drug count because the jury concluded that the State had not proven that the drugs equaled or

exceeded the amount charged in the indictment.  (*Id*. at p. 27.)

**B.       Direct Appeal**

On April 27, 2015, Mr. Carosiello filed a notice of appeal with the Seventh District Court

of Appeals through appellate counsel.  (ECF Doc. 7-1, pp. 29-38.)  In his July 5, 2016 brief (*id.*

at pp. 39-70), he raised the following assignments of error:

> 1.      Nicolas Carosiello's convictions were not supported by sufficient evidence
> in violation of Nick's right to due process of law under the Fifth and
> Fourteenth Amendments to the United States Constitution, and Article I,
> Section 10 of the Ohio Constitution.
>
> Issue #1 Presented for Review: The State did not rebut the presumption that
> Nick could use defensive force against an unlawful intruder in his home.
> Should this Court reverse his convictions because the State failed to rebut
> the Castle Doctrine presumption?
>
> Issue # 2 Presented for Review: The State presented insufficient evidence
> to support a conviction for aggravated murder. Should this Court reverse his
> convictions for aggravated murder because the State failed to support his
> conviction with evidence of prior calculation and design?
>
> 2.      Nicolas Carosiello's conviction for aggravated murder was against the
> manifest weight of the evidence, in violation of Nick's right to due process
> of law under the Fifth and Fourteenth Amendments to the United States
> Constitution, and Article I, Section 10 of the Ohio Constitution.
>
> Issue Presented for Review: Was Nicolas Carosiello's conviction for
> aggravated murder against the weight of the evidence when he acted in self-
> defense?

(*id*. at pp. 40, 44, 53-59.)  The state filed its brief on August 22, 2016 (*id.* at pp. 71-84), and Mr.

Carosiello filed a reply brief on September 6, 2016 (*id.* at pp. 85-93).

On October 5, 2017, the Seventh District Court of Appeals affirmed the judgment of the

trial court.  (ECF Doc. 7-1, pp. 94-128.)  Mr. Carosiello filed a *pro se* notice of appeal with the

Supreme Court of Ohio on November 20, 2017 (*id*. at pp. 129-30) and a memorandum in support

of jurisdiction (*id.* at pp. 131-75), asserting the following propositions of law:

> 1.      Carosiello's convictions are not supported by sufficient evidence, in
> violation of his right to due process under the Fifth and Fourteenth

Amendments to the U.S. Constitution and Article I, Section § 10 of the Ohio Constitution.

2.  Carosiello's conviction for aggravated murder was against the manifest weight of evidence, in violation of his right to due process under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section § 10 of the Ohio Constitution.

(*Id*. at pp. 137-40.)  On December 11, 2017, the State filed a memorandum in response.  (*Id*. at pp. 176-90.)  On March 14, 2018, the Ohio Supreme Court declined to accept jurisdiction of Mr. Carosiello's appeal.  (*Id*. at p. 191.)

**C.  Petition to Vacate or Set Aside Judgment**

On January 23, 2017, Mr. Carosiello filed a *pro se* petition to vacate or set aside his conviction and sentence and requested an evidentiary hearing.  (ECF Doc. 7-1, pp. 192-94.)  He raised the following claim:

Statement of constitutional claim: Deprived of my right to effective counsel under the Sixth Amendment, U.S. Constitution; Section 10, Article I, Ohio Constitution.

Short statement of facts supporting the claim: Failure to call witnesses, failure to interview state and defense witnesses, failure to utilize our private investigator, failure to go to crime scene, failure to conduct investigation, and more.

(*Id*. at p. 193.)  He asserted that evidence supporting his claim was not attached because he needed the assistance of an attorney and investigator.  (*Id*.)  On February 21, 2017, the trial court found that it lacked jurisdiction to consider or determine Mr. Carosiello's petition absent a specific remand of jurisdiction from the court of appeals because his direct appeal was pending, and the petition was not in aid of his appeal.  (*Id*. at pp. 195-96.)  On August 28, 2017, Mr. Carosiello filed a notice of appeal from the trial court's February 21, 2017, judgment entry along with a motion for leave to file delayed appeal.  (*Id*. at pp. 197-206.)  The State filed a response to the motion for leave to file a delayed appeal on August 31, 2017.  (*Id*. at p. 207.)  On September 25, 2017, the court of appeals overruled the motion for delayed appeal and dismissed the appeal,

finding that Mr. Carosiello's direct appeal was pending and the trial court's judgment entry was an interlocutory order.  (*Id*. at p. 208.)

**D.      Application for Reconsideration of Direct Appeal**

On December 14, 2017, Mr. Carosiello filed a *pro se* application for reconsideration of the court of appeals' October 5, 2017 decision overruling his assignments of error.  (ECF Doc. 7-1, pp. 209-20.)  The State filed a response to the motion on December 20, 2017.  (*Id*. at pp. 221-22.)  On March 5, 2018, the state court of appeals denied Mr. Carosiello's application for reconsideration.  (*Id*. at pp. 226-31.)

**E.      Second Petition to Vacate or Set Aside Judgment**

After his direct appeal was concluded, Mr. Carosiello filed a second *pro se* petition to vacate or set aside judgment of conviction or sentence and requested an evidentiary hearing on April 12, 2018.  (ECF Doc. 7-1, pp. 232-37.)  He raised the following claim:

> <u>Statement of constitutional claim</u>: I was deprived of my right to effective assistance of trial counsel as provided by the Sixth Amendment to the U.S. Constitution and Article I, Section § 10 of the Ohio Constitution.
>
> <u>Short statement of facts supporting the claim</u>: My trial counsel failed to call witnesses; failed to interview State and defense witnesses prior to trial; failed to utilize the private investigator they had hired with Court funds; failed to hire a balistics expert; did not request an immunity hearing pursuant to the Castle doctrine; did not collect police reports to establish the victim's pattern of stalking me; did not investigate the crime scene to familiarize themselves with the layout of the house; did not hire an expert witness to determine plausibility of the A/C unit having been pushed into the room and fallen; did not file for change of venue; did not file motion to have allowed the police interview and Grand Jury testimony provided by Rich Lewis, who was an eyewitness at the crime scene, but passed away before the commencement of trial.

(*Id*. at pp. 233-34.)  He said evidence supporting his claim was not attached because he needed the assistance of an attorney and investigator to produce the evidence.  (*Id*. at p. 234.)  On May 22, 2018, the trial court denied the petition, finding it barred by *res judicata*.  (*Id*. at pp. 238-40.)

On June 14, 2018, Mr. Carosiello filed a *pro se* notice of appeal from the trial court's May 22, 2018, denial of his petition to vacate or set aside judgment. (ECF Doc. 7-1, pp. 241-44.) In his August 6, 2018 merit brief (*id.* at pp. 245-59), Mr. Carosiello raised the following assignments of error:

1. The trial court erred in denying Carosiello's post-conviction petition, in violation of his Due Process protections under the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section §10 of the Ohio Constitution.

2. The trial court erred in denying Carosiello's post-conviction petition without a hearing, in violation of his Due Process protections under the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section § 10 of the Ohio Constitution.

(*Id.* at pp. 246, 248, 253-58.) On November 15, 2018, the State filed its brief. (*Id.* at pp. 260-66.) On June 24, 2019, the state court of appeals affirmed the trial court's denial of Mr. Carosiello's petition, but not solely on the basis that the claims were barred by *res judicata*. (*Id.* at pp. 267-78.) The court did find that *res judicata* barred his claims that trial counsel was ineffective for failing to request an immunity hearing, file for a change of venue, and request grand jury transcripts. (*Id.* at pp. 275-76.) However, as to his claims that trial counsel was ineffective for failing to call witnesses, interview witnesses, use a private investigator, hire a ballistics expert, obtain police reports, and investigate the crime scene, the court of appeals denied the claims on the merits because his petition contained only "bare allegations of ineffective assistance of trial counsel" (*id.* at p. 272) and "provide[d] no support for the claims asserted and provide[d] no evidence" (*id.* at p. 274). The court explained that the petition appeared to express "merely a desire for further discovery" (*id.*), that Mr. Carosiello failed to make any showing of how the evidence that he claimed his trial counsel failed to develop would have impacted his trial (*id.*), and that it was "pure speculation whether counsel's performance

10

was deficient and what the effect of the alleged ineffectiveness had on the outcome of the trial"

given his failure to expand on his arguments (*id.* at p. 275).

On August 5, 2019, Mr. Carosiello filed a *pro se* notice of appeal with the Supreme Court

of Ohio (ECF Doc. 7-1, pp. 279-80) and memorandum in support of jurisdiction (*id.* at pp. 281-

305.)  He raised the following two propositions of law:

1.  The trial court erred in denying Appellant's petition for post-conviction relief, in violation of his Due Process protections under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section §10 of the Ohio Constitution.

2.  The trial court erred in denying Appellant's petition for post-conviction relief without holding a hearing, in violation of his Due Process protections under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section § 10 of the Ohio Constitution.

(*Id.* at pp. 282, 287-92.)  On October 15, 2019, the Supreme Court of Ohio declined to accept

jurisdiction of Mr. Carosiello's appeal.  (*Id*. at p. 306.)

**F.    Prior Federal Habeas Corpus Petition**

Petitioner previously filed a federal habeas petition in this Court on February 25, 2019,

which was subsequently amended to assert three grounds for relief, one of which was ineffective

assistance of trial counsel.  (*See Carosiello v. Harris*, Case No. 4:19-cv-00409, ECF Docs. 1, 8,

& 11.)  The amended petition was dismissed without prejudice at Mr. Carosiello's request to

allow him to exhaust his ineffective assistance of trial counsel claim, which was then pending on

appeal before the Supreme Court of Ohio.  (*Id*. at ECF Docs. 23-25.)

**G.    Pending Federal Habeas Corpus Petition**

Mr. Carosiello raises the following four grounds for relief in his pending federal habeas

petition:

11

**GROUND ONE**: Nicolas Carosiello's conviction for aggravated murder was not supported by sufficient evidence, in violation of my right to Due Process of law under the Fifth and Fourteenth Amendments to the United States.

**Supporting Facts**: Petitioner's home was made a target for a home invasion by criminal conspiracy consisting of at least seven individuals. This group was led by my ex-wife, Holly Carosiello, and her brother, Jamie Adkins. Holly and Jamie recruited five individuals, Johnny Paroda, Jordan Gainer, Raymont Bryant, Dustin Green, and Josh Rudder to assist them in the burglary. The group was hoping to steal money and marijuana they believe was in my residence. Over the course of two days, August 11th, 12th, 2011, the group arranged in various combinations, made three separate attempts to feloniously invade my home. I lived in the home with my girlfriend, Martina Michael, my mother, Patty Lewis, and her husband, Richard Lewis. The first attempt was in the evening hours of August 11th. The next day, around noon, the conspirators arrive at my residence for a second attempt. My mother is home alone. The group assembles on my back porch and attempts to enter through my back door. Upon entry, the group is confronted by my mother, who was standing in the kitchen with our large family dog. The dog turns aggressive and chases the conspirators out of my home. My mother calls me, panicked, and Martina and I return home. After being home a couple hours, Johnny Paroda calls and informs me that he "heard" that Jamie Adkins had assembled a group to invade my home and that they were planning another attack. He did not tell me that he was involved. In response, I called my brother, Tony Carosiello, and friends, Brian Specht and Stephanie Deross to come to my home. The three people I called, Martina, and I went to my field beside my house. I armed myself with a .22 caliber rifle and a .22 caliber revolver. I called Johnny Paroda and asked him to inform the conspirators that my home would be vacant for a couple hours, in an attempt to prompt the group into returning. I wanted to catch the group in the act in broad daylight, while I had witnesses, and was armed for our safety. After a couple hours, the confrontation never occurred. Paroda called and informed me that the conspirators could not find a ride and the home invasion was off. My friends left and Martina and I went in the house for the night. The plan to catch the conspirators in the act was abandoned. Around 9:30 p.m., Paroda calls and informs me that he believes the group is in route to my home. I lock and deadbolt both entry doors to my home. About 20 minutes later, my brother Tony drives passed my house and sees a car "full" of people that may be the attackers. He relays this information to me by phone. I immediately try to get my mom, who is sedated on her nighttime medication, and Martina to hide because I feared for their safety. Within 30 seconds, the attackers are attempting to kick my back door in. After repeated kicks, the group is unable to gain entry through the deadbolted door. I run into my bedroom and, almost immediately, my air conditioner gets pushed into my bedroom and the silhouette of a person is crawling through my window. I fired a single shot from my revolver, striking the intruder in the head. The intruder falls out of my window and to the bottom of my cellar stairwell, which was directly below. I learned after going outside and looking down the stairwell that the intruder was my ex-wife, Holly, and she had been killed.

**GROUND TWO**: I was deprived of my right to effective assistance of trial counsel as provided by the Sixth Amendment to the United States Constitution.

**Supporting Facts**: My trial counsel, Jennifer Gorby and Colleen Hall Dailey failed to:

1. Call witnesses Patty Lewis, Brian Specht, Private Investigator Joe Rice, and Jim Watson to testify at my trial.
2. Interview defense witnesses Brian Specht, Patty Lewis, Jim Watson, and Private Investigator Joe Rice prior to trial.
3. Utilize the private investigator, Rodger Lanaghan, who was hired with court approved funds.
4. Collect police reports to establish the victim and her co-conspirators pattern of stalking and harassing Petitioner.
5. Investigate the crime scene to familiarize themselves with the layout of the house and property.

**GROUND THREE**: Nicolas Carosiello's conviction for aggravated murder is in violation of my right to Due Process, under the Fifth and Fourteenth Amendments and right to a jury trial verdict of "beyond a reasonable doubt," in violation of the Sixth Amendment of the United States Constitution.

**Supporting Facts**: Petitioner is challenging the constitutionality of Ohio Revised Code § 2901.05(B) (2015). This statute creates a presumption that a homeowner is acting in self-defense and defense of another if he uses deadly force against an intruder, who has unlawfully entered his home. The burden is on the prosecution to rebut this presumption. The standard of proof is "by a preponderance of the evidence." (B)(3). It is my position that because the Ohio Legislature has allocated the burden of proof to the prosecution, under the circumstances set forth in the statute, the rebuttal of the presumption is a "fact necessary" for conviction, and the Constitution requires the standard of proof to be "beyond a reasonable doubt." "Facially" and "as-applied" at my trial, the statute is in violation of[] the principle set forth in In Re Winship, 397 U.S. 358 (1970). I am asking the Court to not apply the ruling in Martin V. Ohio, 480 U.S. 228 (1987), which applied to a different section of the statute, to this radically different situation.

**GROUND FOUR**: Petitioner's conviction for aggravated murder is in violation of my substantive right of self-defense, under the Second Amendment, the "Privileges and Immunities" clause of the Fourteenth Amendment, my right against state abridgment, under the Fourteenth Amendment, and my right to the procedural application of this substantive right, under the Due Process clause of the Fourteenth Amendment, and right to a fair trial and jury verdict of "beyond a reasonable doubt," under the Sixth Amendment.

**Supporting Facts**: Petitioner is seeking a declaration that the Second Amendment guarantees me the "substantive right" To use a firearm in defense of self, family, and home, within the home, against an unlawful intruder. In the alternative, this "substantive right" exists by way of the "Privileges and Immunities" Clause of the Fourteenth Amendment. In addition to this right, Petitioner is seeking to establish a standardization of the procedural application of this substantive right. Petitioner is proposing that if there is any evidence that the defendant used a firearm against an intruder, who unlawfully entered his residence, then the burden of proof should be on the prosecution to prove absence of self-defense, defense of another, and defense of residence, "beyond a reasonable doubt." The States should still be allowed to choose and define the elements of the defense, but the standard of proof and the allocation of the burden of proof must meet this constitutional standard. This procedure would be similar to the constitutional ruling announced in In Re Winship, 397 U.S. 358 (1970), but applied to the elements of an affirmative defense. And accordingly, a standard of review similar to Jackson v. Virginia, 443 U.S. 307 (1979), that the federal courts can employ in habeas corpus cases, to determine if state convictions are in accord with this constitutional protection. "Facially" and "as-applied" to my case, O.R.C. § 2901.05 (B) (2015) is an abridgement of this constitutional protection and a violation of my Due Process rights under the Fourteenth Amendment, and right to a fair trial and jury verdict of "beyond a reasonable doubt," under the Sixth Amendment.

(ECF Doc. 1 pp. 5-6, 8-9; ECF Doc. 1-2, pp. 1-2.)

### III.    Law & Analysis

#### A.    Standard of Review Under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), apply to petitions filed after the effective date of the AEDPA. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). "As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Id.* (citing 28 U.S.C. §§

14

2254(a), (b), (c)).  Further, if an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application "shall not be granted" unless the adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Pinholster*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).  The burden of proof rests with the petitioner.  *See Pinholster*, 563 U.S. at 181.

Under § 2254(d)(1), "[a] decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'"  *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).  As explained by the Supreme Court, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1)" and "therefore cannot form the basis for habeas relief under AEDPA."  *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012).  "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  *Otte*, 654 F.3d at 599–600 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous."  *Lockyer v.*

*Andrade*, 538 U.S. 63, 75 (2003).  "The state court's application of clearly established law must be objectively unreasonable." *Id.*

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting and citing 28 U.S.C. § 2254(d)(2)).  The Sixth Circuit has explained that "[a] state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record[]")(quoting and citing 28 U.S.C. § 2254(d)(2) and § 2254(e)(1)). *Matthews*, 486 F.3d at 889.  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt*, 571 U.S. at 18 (internal citations and quotations omitted).

The Supreme Court has explained that under AEDPA "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102.  The "standard is difficult to meet" and "was meant to be" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03

16

(quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)

(Stevens, J., concurring in judgment)).  In short, "[a] state court's determination that a claim

lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

correctness of the state court's decision." *Id*. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S.

652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004)).

**B.      Legal Standard for Procedural Default**

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted

all available remedies in state court.  *See* 28 U.S.C. § 2254(b)(1)(A).  A state defendant with

federal constitutional claims must fairly present those claims to the state courts before raising

them in a federal habeas corpus action.  *See* 28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459

U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *see also Fulcher*

*v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to consider

a claim in a habeas petition that was not 'fairly presented' to the state courts").

To satisfy the fair presentation requirement, a habeas petitioner must present both the

facts and legal theories underpinning his claims to the state courts.  *See McMeans v. Brigano*,

228 F.3d 674, 681 (6th Cir. 2000).  This means that the petitioner must present his claims to the

state courts as federal constitutional issues and not merely as issues arising under state law.  *See,*

*e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 33-34 (2004); *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th

Cir. 1987).  A constitutional claim for relief must also be presented to the state's highest court to

satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48

(1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

A petitioner must also meet certain procedural requirements to have his claims reviewed

in federal court.  *See Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 2006).

"Procedural barriers, such as . . . rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001).  Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts.  *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Failure to exhaust applies where state remedies are "still available at the time of the federal petition."  *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, procedural default applies where state court remedies are no longer available.  *See Williams*, 460 F.3d at 806.

Procedural default may occur in two ways.  First, a petitioner may procedurally default a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court."  *Id.*  In *Maupin v. Smith,* the Sixth Circuit articulated a four-prong analysis to be used when determining whether a claim is procedurally barred due to failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim, and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error.  785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

18

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'"  *See Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."); *State v. Moreland*, 552 N.E. 2d 894, 899 (Ohio 1990) (finding failure to present a claim to a state court of appeals constituted a waiver).  "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806.  Thus, even if the exhaustion requirement is technically satisfied because no state remedies remain available to the petitioner, the petitioner's prior failure to present those claims for consideration in state court may cause a procedural default that bars federal court review of the claims.  *See Williams,* 460 F.3d at 806 (citing *Coleman v. Thompson,* 501 U.S. 722, 732 (1991)).

To overcome procedural default, a petitioner must: (1) show cause for the default and demonstrate that actual prejudice resulted from the alleged violation of federal law; or (2) show that there will be a fundamental miscarriage of justice if the claims are not considered. *See Coleman*, 501 U.S. at 750.  "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

**C.**      **Whether Petitioner has Rebutted the Presumption of Correctness Afforded the State Appellate Court's Factual Determinations by Clear and Convincing Evidence**

In his Traverse, Mr. Carosiello identifies thirteen factual findings made by the state court of appeals which he contends are not entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).  (ECF Doc. 17-1, pp. 12-21.)   The undersigned turns to this argument before addressing Mr. Carosiello's grounds for relief.

In contrast to 28 U.S.C. § 2254(d)(2), which asks whether a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," AEDPA also provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Burt*, 571 U.S. at 18 (explaining that a state court petitioner "bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence'") (quoting and citing 28 U.S.C. § 2254(e)(1)).  "Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Elder v. Berghuis,* 644 F. Supp. 2d. 888, 893 (W. D. Mich. 2009) (citing *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007)).

The Supreme Court has indicated that §§ 2254(d)(2) and (e)(1) should not be merged, stating: "AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence. The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions." *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).  While the Supreme Court has explained that the two provisions should not be merged, the Supreme Court has not directly addressed "how §§ 2254(d)(2) and (e)(1) fit together." *Wood v. Allen*, 558 U.S. 290, 300 (2010);[2] *Collins v. Metzger*, No. CV 16-751-LPS, 2022 WL 608925, at *4 (D. Del. Feb. 7, 2022)

---

[2] In *Wood*, the Supreme Court "granted review of a question that has divided the Courts of Appeals: whether, in order to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Id.* at p. 299.  But, upon

(noting the absence of explicit guidance from the Supreme Court on how to approach the interplay between §§ 2254(d)(2) and 2254(e)(1)), *on reconsideration in part sub nom. Collins v. May*, No. CV 16-751-GBW, 2023 WL 2663089 (D. Del. Mar. 28, 2023).  Nevertheless, as one circuit court has explained:

> two points are paramount. First, both (d)(2) and (e)(1) express the same fundamental principle of deference to state court findings. Second, before the writ can be granted, petitioner must show an unreasonable determination—under (d)(2)—in light of the entire record in the original state court trial.

*Lambert v. Blackwell*, 387 F.3d 210, 236, n. 19 (3d Cir. 2004).

Mr. Carosiello contends that he can rebut the state court of appeals' factual findings by clear and convincing evidence.  Each of the findings challenged by Mr. Carosiello are addressed and outlined below to correspond to Mr. Carosiello's numbering in his Traverse.   For the reasons explained, the undersigned concludes that Mr. Carosiello has not satisfied the high burden that is required of him to overcome the presumption of correctness provided to the state court's factual determinations.

1. <u>State Court Adjudication, ¶ 2 (sentence 1)</u>: "Appellant is a known drug dealer who kept large amounts of marijuana and cash inside his residence, which is located in Wellsville. (12/29/15 Trial Tr., pp. 726, 892, 965.)"

   Mr. Carosiello contends the state court of appeals incorrectly found that he kept marijuana "in his residence."  (ECF Doc. 17-1, p. 13.)  He contends the evidence shows he kept marijuana in his barn.  (*Id*.)  He asserts that the cited transcript pages are from the testimony of Johnny Paroda, Jamie Adkins, and Martina Michael and that testimony only shows that he "sold and would have varying amounts of marijuana and cash," not where the marijuana was located.  (ECF Doc. 17-1, p. 13.)  He asserts that only one of those three witnesses—Ms. Michael—testified to where Mr. Carosiello kept his marijuana, and she testified it was kept "in the barn."  (*Id*. (citing Tr. 728 (ECF Doc. 7-5, p. 89).)  Further, he states he testified that "the marijuana was 'never in [his] residence' and it was always 'in the barn.'"  (*Id*. (citing Tr. 728 and Tr. 1131).)

---

concluding that "under § 2254(d)(2), the state court's finding that Wood's counsel made a strategic decision not to pursue or present evidence of Wood's mental deficiencies was not an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings[,] [it] therefore [did] not need to decide whether that determination should be reviewed under the arguably more deferential standard set out in § 2254(e)(1)." *Id.* at 300.

The undersigned finds that the state court's factual determination has evidentiary support and Mr. Carosiello has not rebutted this factual determination by clear and convincing evidence. Although the state court provided citations to some portions of the record, that is not the only evidence of record regarding Mr. Carosiello's involvement in drugs or the location of his drugs and money. For instance, Mr. Carosiello's brother, Tony Carosiello, testified that he was aware that Mr. Carosiello "was dealing and selling marijuana" and that "he would have marijuana and money there at his residence." (ECF Doc. 7-6, p. 209.)

2.  <u>State Court Adjudication, ¶ 2 (sentence 3)</u>: "This group of would-be thieves consisted of Holly Carosiello (the victim and Appellant's estranged wife), Jamie Adkins (Holly's brother), Jordan Gainer (Holly's cousin), and Johnny Paroda (Holly's cousin). *Id.* at pp. 896–899, 767."

    Mr. Carosiello "take[s] issue with the state court's characterization of these individuals as 'would-be thieves.'" (ECF Doc. 17-1, p. 14.) He contends that "[a] more precise description would be conspirators, burglars, and home invaders." (*Id.*)

The undersigned finds Mr. Carosiello has not presented clear and convincing evidence to rebut the presumption of correctness of this finding. While he believes a "more precise" description to be appropriate, he has not shown by clear and convincing evidence that the court's characterization was inaccurate.

3.  <u>State Court Adjudication, ¶ 4 (sentence 3)</u>: "Around 4:00 p.m., Johnny called Appellant and told him that Jamie, Jordan, and Raymont had been to his house to steal his drugs and money, and that they would be back."

    Mr. Carosiello contends that the evidence does not support a finding that Mr. Paroda specifically said he was going there for only drugs and money, pointing to evidence that he testified that "Mr. Paroda 'didn't say anything about marijuana or money or anything specific. He said they were to (sic) rob me'" and Mr. Paroda testified "he wasn't 'necessarily going out there just for drugs and money' that if he 'saw jewelry, guns, or other items' he 'probably would have' taken them too." (ECF Doc. 17-1, pp. 14-15 (citing ECF Doc. 7-8, p. 18; ECF Doc. 7-6, p. 39).)

The undersigned finds Mr. Carosiello has not presented clear and convincing evidence to rebut the presumption of correctness of this finding. Mr. Paroda's testimony that he might have stolen

"other items," in addition to "drugs and money," certainly does not negate the court of appeals'

finding.  And Mr. Carosiello's own testimony as to what Mr. Paroda said does not prove that the

state court of appeals' finding was unsupported by the record, particularly when that court found

Mr. Carosiello "had significant credibility issues."  (ECF Doc. 7-1, pp. 121-25, ¶¶ 70-83.)

4.  <u>State Court Adjudication, ¶ 5 (sentence 5, 6)</u>: "Appellant hid his money and moved his
    drugs deep into a barn on the property. He moved all the cars to a field behind the
    house. *Id.* at pp. 742, 1094, 1355."

    Mr. Carosiello contends "the marijuana was never moved to the barn, it was always
    there" and "not 'all the cars' were moved to the field."  (ECF Doc. 17-1, p. 15.) He
    argues specifically that Ms. Michael testified that his mother's car "was left out front and
    never moved" and there was evidence showing his own vehicle was in the backyard, next
    to the back porch, not in the field.  (*Id.*)  Thus, he asserts the court of appeals was
    "mistaken about the location of the vehicles."  (*Id.*)

The undersigned finds that Mr. Carosiello has not rebutted this factual determination by clear

and convincing evidence.  As to the location of the marijuana, Tony Carosiello testified that Mr.

Carosiello "would have marijuana and money there at his residence."  (ECF Doc. 7-6, p. 209.)

As to the finding that Mr. Carosiello moved all the cars to the field, the record contains evidence

to support that finding.  Ms. Michael did testify that Mr. Carosiello's mother's car was parked

out front, but also testified that it "was always there and never moved."  (ECF Doc. 7-5, p. 108.)

She also testified that Mr. Carosiello took steps to move all the cars out back in the field; when

Mr. Carosiello's sister pulled in the driveway, she testified that Mr. Carosiello was upset and

requested that she "pull her car around back and hide it where he had his cars hidden . . .

[a]lready in the back of the field."  (*Id.*)  Mr. Carosiello's brother also testified that "[t]he

vehicles were in the backyard."  (ECF Doc. 7-6, p. 206.)  Mr. Carosiello himself testified that he

hid his vehicle that day "to catch them in the act of trying to break into [his] house at 5:00 in the

afternoon."  (ECF Doc. 7-8, p. 97.)

5. <u>State Court Adjudication, ¶ 5 (sentence 8)</u>: "Appellant and his friends then concealed themselves in the field behind the house and waited for the thieves to arrive. *Id.* at pp. 743, 864."

Mr. Carosiello "take[s] issue with the word concealed." (ECF Doc. 17-1, p. 16.)  He asserts that they were drinking, smoking, and talking in normal voices, and therefore argues the state court's use of the word "concealed" is not supported.  (*Id.*)  However, he does acknowledge evidence that they were in the field "so that [they] would be hidden from view of the road."  (*Id.*)  He states that "the [cited] testimony does not support the conclusion that [they] were 'concealing' [themselves] in any way, <u>other than the fact that they couldn't see [them] from the road</u>."  (*Id.* (emphasis added).)  Additionally, he testified that he did tell the detective they had been laying in the grass to "conceal" themselves, so "they wouldn't see [them] back there and we could catch them in the act . . ." (ECF Doc. 7-8, p. 99.)

The undersigned finds Mr. Carosiello has not presented clear and convincing evidence to rebut the presumption of the correctness of this finding.  While he might interpret the word "concealed" in a more limited way than the state court of appeals, he has not shown by clear and convincing evidence that the state court of appeals' characterization was inaccurate.

6. <u>State Court Adjudication, ¶ 6 (sentence 1)</u>: "Appellant instructed Johnny to tell Jamie that he would be out of the house for a few hours and that his mother and stepfather were out of town for a funeral"

Mr. Carosiello asserts this finding is incorrect because one witness testified that he "told Johnny to tell Jamie that [he] would only be gone for 'two hours.'"  (*Id.* at pp. 16-17.)

The undersigned finds that Mr. Carosiello has not rebutted this factual determination by clear and convincing evidence.  Mr. Carosiello acknowledges he told Paroda to tell "the burglars that [he] would be gone for a 'couple hours' . . . at 5:00 p.m." and that Stephanie Deross testified that "she heard [him] tell [Johnny] Paroda to inform the burglars the house would be empty for 'two hours.'"  (ECF Doc. 17-1, p. 122.)  His testimony reflects that he told Mr. Paroda around "5 or 6:00, 5:00 maybe" that he "was going to be gone for a little bit," that he had gone to "the junkyard with [his] brother to get some parts."  (ECF Doc. 7-8, pp. 21-22.)  He did not recall whether he "specifically set a two-hour timeframe."  (*Id.* at p. 23.)  Ms. Deross also testified that

Mr. Carosiello "told Johnny to let them [the burglars] know that . . . his parents were going to be out of town to basically look like no one was home, because there was no cars or vehicles or anything." (ECF Doc. 7-5, p. 229.)  Ms. Michael testified similarly.  She testified that she heard Mr. Carosiello tell "Johnny that when he talked to Jamie to say that Nick's mom and dad went to a funeral and that Nick and me went with Tony to fix his car." (ECF Doc. 7-5, pp. 161-62.)  This evidence supports the state court's factual determination.  His argument, which takes issue with the state court's use of "few" versus "two" hours, is a matter of semantics and he has not shown by clear and convincing evidence that the court's finding was incorrect or unsupported.

7.  <u>State Court Adjudication, ¶ 6 (sentence 3)</u>: "At some point, Appellant believed that they were not coming, and his friends left."

Mr. Carosiello asserts this determination is incorrect because "[t]his did not occur at just 'some point[,]'" stating he testified "this occurred around 7:00 p.m. and [he] 'believed' this because Johnny Paroda told [him], during a phone call, that the burglars '[could not] find a ride' and 'they[] [were] not coming.'" (ECF Doc. 17-1, p. 17 (citing ECF Doc. 7-8, p. 27).)  In fact, his testimony was "I'd like to say it was around 7, 7ish sometime, a little bit after maybe." (ECF Doc. 7-8, p. 27.)

The undersigned finds Mr. Carosiello has not rebutted, by clear and convincing evidence, the state court of appeals' factual finding that Mr. Carosiello believed "at some point" that others were not coming.  While Mr. Carosiello may have preferred that the court be more precise as to when that belief arose, he has not shown by clear and convincing evidence that the state court's more general language was unsupported or incorrect.

8.  <u>State Court Adjudication, ¶ 8 (sentence 6)</u>: "When no one answered, Jamie unsuccessfully tried to kick down the door. *Id.* at p. 980."

Mr. Carosiello contends this determination is incorrect because one witness testified that "Jamie Adkins and Holly Carosiello kicked on the back door." (ECF Doc. 17-1, p. 17.)

The undersigned finds that Mr. Carosiello has not rebutted this factual determination by clear and convincing evidence.  It is undisputed that Jamie attempted to kick down the door, regardless

25

of who may have assisted him.  Mr. Carosiello therefore has not shown by clear and convincing evidence that the state court's factual determination was unsupported or incorrect.

9.  State Court Adjudication, ¶ 8 (sentence 1): "While this was occurring, Appellant was waiting in his room, armed with a .22 caliber pistol. *Id.* at p. 1294."

Mr. Carosiello asserts the "state court uses the phrase 'waiting in his room' like [he] had been there for an extended period of time," and argues that is not accurate because there "was no 'waiting' involved, this was a quick eruption of events."  (ECF Doc. 17-1, pp. 17-18.)

The undersigned finds that Mr. Carosiello has not rebutted this factual determination by clear and convincing evidence.  The sentence immediately proceeding this statement is "Then, suddenly, the unit slid smoothly inside the house."  (ECF Doc. 7-1, p. 98.)  While Mr. Carosiello disputes that he assisted with removal of the air conditioner, he does not dispute that he was in the room when the air conditioner came out of the window.  Further, the state court of appeals heard and considered his testimony, finding "significant credibility issues" with his testimony (ECF Doc. 7-1, p. 121) and his "version of the facts . . . not in accord with any of the other witnesses' testimony or with the physical evidence, consisting of . . . photographs[]" (*id.* at p. 125).  Mr. Carosiello has not shown by clear and convincing evidence that the state court of appeals' characterization is unsupported or incorrect.

10.  State Court Adjudication, ¶ 9 (sentence 3): "The shot hit Holly between her eyes."

Mr. Carosiello contends this determination is not accurate because the forensic pathologist "testified that the gunshot wound was not 'between her eyes', but 'was on her forehead, just left of the midline of her forehead'" and "the shot was not point-blank or a contact shot, but was fired at a distance greater than a couple feet away."  (ECF Doc. 17-1, p. 18.)

The undersigned finds that Mr. Carosiello has not rebutted this factual determination by clear and convincing evidence.  Not only does Mr. Carosiello's argument amount again to semantics,

this factual determination has support in the record before the state court. (ECF Doc. 15-4, p. 15;

*see also* ECF Doc. 7-8, p. 122).)

11. <u>State Court Adjudication, ¶ 9 (sentence 6)</u>: "Jamie tried to get to Holly, but when he saw the back door open, he and Dustin fled as Appellant fired into the backyard."

Mr. Carosiello contends that the "sentence is stated in a way that suggests that [he] opened the back door and fired shots from the backdoor into the backyard" but it was his stepfather who opened the back door while Mr. Carosiello fired from the window. (ECF Doc. 17-1, p. 18.)

The undersigned finds Mr. Carosiello has not rebutted this factual determination by clear and

convincing evidence. He does not dispute that he fired shots out the window into the backyard

(*id*.; ECF Doc. 7-8, pp. 39-40, 129) or that the back door was opened (ECF Doc. 17-1, p. 18).

His argument that the court of appeals' language could be read to suggest that Mr. Carosiello

opened the back door, rather than his step-father, is inadequate to support a finding by clear and

convincing evidence that the court's factual finding was unsupported or incorrect.

12. <u>State Court Adjudication, ¶ 10 (sentence 4, 10)</u>: "Roxanne, who is a nurse, checked Holly and told Appellant to call 911, because she thought she felt a faint pulse. Id. at p. 1066 . . . At some point, Appellant's stepfather did call 911."

Mr. Carosiello asserts ¶ 10, and in particular these two sentences, are "misleading as to the timing and order, in which these events unfolded." (ECF Doc. 17-1, p. 19.) He contends that the state court's recitation of the evidence "suggests a seemingly long series of events that occurred before [they] 'at some point' called 911." (*Id*.) He contends that the state court of appeals did not recite other evidence relating to this sequence of events, which he asserts would tell a different version of what transpired. (*Id*.)

The undersigned finds that Mr. Carosiello has not rebutted this factual determination by clear

and convincing evidence. His contention that the state court should have given a more specific

recitation of events or timing falls far short of showing by clear and convincing evidence that the

factual findings of the state court of appeals were unsupported by the evidence presented. The

fact that the state court of appeals did not state the specific time when a 911 call was placed does

not make its more general finding incorrect.

27

13. <u>State Court Adjudication, ¶ 10 (sentences 8, 9)</u>: "Appellant was apparently prohibited from being in possession of a gun due to a previous criminal conviction. Shortly thereafter, Tony left, and Appellant and his stepfather began hiding the drugs and putting their guns away."

Mr. Carosiello asserts that this is unsupported because the court of appeals reached unsupported conclusions.  Although a witness testified that Mr. Carosiello was not allowed to have a gun, he asserts that there was nothing to support a statement that he was not allowed "due to a previous criminal conviction."  (ECF Doc. 17-1, p. 20.)  And although there was testimony that people were "putting their guns away and hiding things," he asserts there was no testimony that they were "hiding 'drugs'" (*id*).

The undersigned finds Mr. Carosiello has not rebutted these findings by clear and convincing evidence.  As to his ability to possess a gun, the court of appeals found only that Mr. Carosiello was *apparently* prohibited from possessing a gun, consistent with witness testimony that he was "trying to get different people in the house to say that they had shot because he said that [they] were allowed," while he "wasn't allowed to have a gun."  (ECF Doc. 7-5, p. 122.)  Regardless of whether his criminal history actually precluded him from possessing a gun, his statements that he was not allowed to have a gun were sufficient to support the court's finding that he was "apparently prohibited" due to his criminal history.  As to whether people were "hiding the drugs" or simply "things," the record included testimony that Mr. Carosiello "was dealing and selling marijuana" and "would have marijuana and money . . . at his residence" (ECF Doc. 7-6, p. 209), that police confiscated marijuana found during the search of the house after the shooting (ECF Doc. 7-5, pp. 46, 125), and that Mr. Carosiello's brother came to the house the day after the shooting and Mr. Carosiello gave him a shopping bag containing marijuana and told him "it had to go" (ECF Doc. 7-6, pp. 222-23).  Mr. Carosiello has not shown by clear and convincing evidence that the state court's factual finding that witnesses were "hiding the drugs and putting their guns away" after the shooting was unsupported by the record.

D.     **Ground One**

Mr. Carosiello argues in Ground One that federal habeas relief is warranted because his conviction for aggravated murder was not supported by sufficient evidence.  (ECF Doc. 1, p. 5, ECF Doc. 17-1, pp. 74-126.)  First, he challenges the jury's finding that he was guilty of aggravated murder, asserting that the State failed to present sufficient evidence at trial to prove the elements of aggravated murder under O.R.C. § 2903.01(A).  (ECF Doc. 17-1, pp. 79-119.) Second, he attacks the state court of appeals' sufficiency determination.  (*Id*. at pp. 119-26.) Respondent argues that Ground One is without merit.  (ECF Doc. 7, pp. 22-32; ECF Doc. 18.)

1.     **Legal Framework for Sufficiency of Evidence Claims**

A sufficiency-of-the-evidence claim is cognizable on federal habeas review.  *See In re Winship*, 397 U.S. 358, 364 (1970).  In reviewing such a claim, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

In determining the sufficiency of the evidence, a court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury."  *Brown v. Koneth*, 567 F.3d 191, 205 (6th Cir. 2009); *see also Matthews v. Abramajtys,* 319 F.3d 780, 788 (6th Cir. 2003).  This "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original).  "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal citations, quotations, and alterations omitted); *see also Durr v. Mitchell*,

487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence").

On federal habeas review, an additional layer of deference applies to questions of sufficiency of the evidence. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; [and] second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). The Sixth Circuit has explained the two-step deferential analysis as follows:

> First, we must ask whether the evidence itself was sufficient to convict under Jackson. The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner]. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010). Thus, even if this Court were "to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205 (citing 28 U.S.C. § 2254(d)(2)) (emphasis in original)*; see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).

Consistent with the foregoing framework for review of sufficiency challenges under AEDPA, the undersigned turns first to Mr. Carosiello's claim that there was insufficient evidence to convict him of aggravated murder under the *Jackson* standard.

### 2.    Whether Evidence Was Sufficient to Convict for Aggravated Murder

Mr. Carosiello contends that there was insufficient evidence upon which the jury could find him guilty of aggravated murder under O.R.C. § 2903.01(A). (ECF Doc. 17-1, pp. 79-80.)

As the state court of appeals explained, Ohio's aggravated murder statute provides that: "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" (ECF Doc. 7-1, p. 105 (quoting R.C. 2903.01(A)).)  Mr. Carosiello asserts that "[t]he strands of circumstantial evidence presented at trial, in support of [the] elements [of aggravated murder], was far from sufficient to establish guilt under Jackson v. Virginia."  (ECF Doc. 17-1, pp. 79-80.)  He argues there are "several key events . . . disputed on a factual, legal and constitutional basis" and asserts that his version of events shows he was the "victim of a home invasion" not a "murderer" as alleged by the State.  (*Id.* at p. 81.)

Mr. Carosiello lays out various "events"—described as the field, the confrontation, his possession of firearms, the vehicles, and the air conditioner (*id.* at pp. 81-102)—and argues the evidence is not sufficient to find that he purposely caused the death of Holly Carosiello with prior calculation and design (*id.* at pp. 103-19).  He then describes the evidence he claims is supportive of his version of the events and his self-defense argument.

First, he argues that the following evidence weighs against a finding that he <u>purposely</u> shot Holly Carosiello: (1) he used a .22 caliber pistol, which was smaller than other weapons at his disposal and the "least likely type of gun to fatally wound an individual"; (2) he "only fired a single shot at the intruder as she was crawling through the window," and later fired additional shots only to get the intruders to disperse; (3) Dr. Timm testified that the "shot was not a point-blank, contact, or execution style shot, but was fired at a distance greater than a couple feet"; (4) the victim could only be shot in the upper body while she was crawling through the window; (5) his demeanor immediately following the shooting was described by witnesses as "emotional, panicked, distraught, in shock, scared, and crying," and was not that of someone who had a "'purposeful' intent to kill"; (6) he did not attempt to flee; (7) there was no evidence of motive to

kill the mother of his children; and (8) evidence that he acted in self-defense with a sole purpose of stopping those who were trying to attack his home.  (ECF Doc. 17-1, pp. 103-07.)

Next, he contends that the evidence was insufficient to support a finding of prior calculation and design. (*Id*. at pp. 83, 108-17.)  He argues the evidence does not support a finding that he was lying in wait or otherwise lured Holly Carosiello at the time of the fatal shooting. (*Id*.)  Instead, he asserts that any plan he and his group had earlier in the day was to "catch the perpetrators in the act" and "[b]eyond that [they] had no clear plan as to what [they] would have done if the invaders had arrived" when they were waiting in the field.  (*Id.* at pp. 83, 108-11.) Further, he argues that "the attackers never arrived and Mr. Paroda called [him] and informed [him] that they could not find a ride and were not coming," at which point "the plan to catch them in the act was abandoned" and he and his girlfriend returned inside while the others left. (*Id*. at p. 83.)

He also argues that the State's reliance on his possession of a firearm to establish prior calculation and design is insufficient, since he had a right to possess a firearm to defend his home and any reasonable gun owner would have armed himself if he knew a violent group of people intended to commit a felony home invasion.  (*Id*. at p. 110.)  He further argues that evidence indicating he locked and dead bolted the two entrances to his home when he learned at 9:27 p.m. that the group might be returning to his home was enough "evidence alone . . . to create a reasonable doubt as to whether [he] had created a scheme designed to carry out the calculated decision to kill, that no reasonable juror could overlook."  (*Id*. at p. 112.)

He also argues that prior calculation and design cannot be inferred from the State's theory that he "assisted the burglars in removing the air conditioner." (*Id*. at pp. 96-102, 112-13.)  He asserts that the air conditioner came flying through the window, and the State's theory—that he

pulled a 52-pound air conditioner unit out of the window in the dark and placed it on a tote without disturbing anything in the area, including a fragile oil burner, and without the intruders knowing—is illogical and unreasonable. (*Id*. at pp. 96-102.)  He argues that "the picture of how the air conditioner landed tells it all" (*id*. at p. 97 (ECF Doc. 15-4, pp. 30, 34)) and that "it is apparent from the record[ that] Jamie Adkins pushed [the] air conditioner in, without any assistance from [Mr. Carosiello], whatsoever" (*id.* at p. 102).  Even if the State's theory regarding the air conditioner is believed, he also argues that his action "would be a result of only 'instantaneous' deliberation" rather than prior calculation and design. (*Id*. at pp. 112-17.)

Finally, Mr. Carosiello argues that the evidence is insufficient to prove that it was his action that <u>caused</u> Ms. Carosiello's death. (ECF Doc. 17-1, pp. 117-19.)  Specifically, he posits that "it was the home invasion that 'caused the death' of Holly Carosiello, not [his] act of pulling the trigger." (*Id*. at p. 119.)

As an initial matter, while Mr. Carosiello argued in state court that there was insufficient evidence presented to support a finding that he acted with prior calculation and design (ECF Doc. 7-1, pp. 56-58, 105), he did not fairly present claims in that court that there was insufficient evidence of <u>purpose</u> or <u>cause</u>.  Thus, the above arguments regarding purpose and cause are summarized only as context to the claim in Ground One that there was insufficient evidence to support a finding of <u>prior calculation and design</u>.  Since the arguments regarding purpose and cause were not fairly presented in state court, they are not properly before this Court and are not considered herein. *See Fulcher*, 444 F.3d at 798.  ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").

Turning to whether there was sufficient evidence presented to support the jury's verdict of prior calculation and design, the undersigned notes initially that Mr. Carosiello has not

presented clear and convincing evidence to rebut the presumption of correctness afforded the state court of appeals' factual determinations, as addressed in more detail in Section III.C., *supra*.  Further, although Mr. Carosiello argues his version of the events is correct, it cannot be ignored that the jury considered the evidence presented at trial and found him guilty of aggravated murder.  Deference is due to the jury's determination, *Brown*, 567 F.3d at 205, since the jury considered the evidence and evaluated the testimony and credibility of all witnesses, including Mr. Carosiello's testimony in his own defense (ECF Doc. 7-8, pp. 5-170).  Additionally, as the Supreme Court explained in *Jackson*, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Id.* at 326.

Mr. Carosiello has not shown that the jury's decision to convict him of aggravated murder based on the evidence presented at trial was irrational.  As the state court of appeals explained, "[a]n appeal contesting a finding of prior calculation and design is evaluated by looking at the totality of the circumstances on a case-by-case basis."  (ECF Doc. 7-1, p. 108 ¶ 32 (citing *State v. Kerr*, 2016-Ohio-8479, ¶ 22, 2016 WL 7626278, at *5 (Ohio App. Ct. 2016).)  Rather than a bright-line test for assessing prior calculation and design, several factors are considered.  (*Id*. at ¶ 33 (citing *State v. Franklin*, 97 Ohio St.3d 1, 2002–Ohio–5304, ¶ 56–60 (2002)).  Those factors include "whether the defendant and victim knew each other, if the relationship was strained, whether the defendant gave thought in choosing the murder weapon or site, and whether the act was drawn out or sprung from an instantaneous eruption of events."  *Id.*

Here, there is no dispute that Mr. Carosiello and the victim knew each other and there is evidence that their relationship was strained, the victim being Mr. Carosiello's estranged wife.

34

(ECF Doc. 7-1, p. 108 ¶ 34.)  Mr. Carosiello was also aware that a group of individuals who planned to rob his home were returning to his home, and armed himself with a gun instead of calling the police.  Regardless of whether Mr. Carosiello had a right to possess a firearm and to defend his home, the jury found the evidence supported a conviction for aggravated murder, beyond a reasonable doubt, and that Mr. Carosiello did not act in self-defense.

Additionally, as the state court of appeals explained, "[p]rior calculation and design can be found where a defendant 'quickly conceived and executed the plan to kill within a few minutes." *Id.* at ¶ 32 (citing *State v. Coley*, 93 Ohio St.3d 253, 264 (2001)).  Here, there is no dispute that Mr. Carosiello shot and killed Holly Carosiello.  (ECF Doc. 17-1, p. 79.) "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson*, 200 F.3d at 992 (internal citations, quotations, and alterations omitted).  Thus, even assuming *arguendo* that an earlier plan to "wait" for the attackers was abandoned, it was not irrational for the jury to find prior calculation and design based on circumstantial evidence, including evidence that could support a finding that Mr. Carosiello aided in the removal of the window air conditioner in order to shoot his attacker.  The jury was shown pictures demonstrating the position of the air conditioning unit after the shooting.  (ECF Doc. 15-4, p. 30.)  While Mr. Carosiello argues the pictures support his testimony that he did not remove the air conditioner, the jury could reasonably have found otherwise.

In assessing the sufficiency of the evidence, a court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown*, 567 F.3d at 205.  The jury heard testimony from witnesses that Mr. Carosiello planned to shoot at someone if they came to his home.  Ms. Michael testified that while they were out back

35

"hiding," Mr. Carosiello had a gun and "said that if somebody came he was going to shoot

them." (ECF Doc. 7-5, p. 109.) Ms. Deross testified that Mr. Carosiello "said if someone steps

foot in the field, which is like his yard, or if he sees like them trying to attempt to kick the door

down, he was going to shoot." (*Id*. at p. 230; *see also id.* at 229 (Ms. Deross testimony regarding

her observations when they were out back: "From what everything looked like, Nick was going

to shoot someone".)

The jury heard Mr. Carosiello's testimony and weighed his credibility, just as they

weighed the testimony of multiple other witnesses. Notably, as the state court of appeals

explained: Mr. Carosiello "admittedly gave at least four untruthful statements to investigators,"

(ECF Doc. 7-1, p. 121, ¶ 70); his "version of the facts [was] not in accord with any of the other

witnesses' testimony or with the physical evidence, consisting of phone records and

photographs"; and "[a]ll the other witnesses corroborated, in the main, one another's version of

the events," (*id.* at ¶ 83). This Court's inquiry is not focused on whether the jury "made the

correct guilt or innocence determination, but rather whether it made a *rational* decision to

convict or acquit." *Herrera*, 506 U.S. at 402.

When assessing whether "*any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt," the Court must view "the evidence in the light

most favorable to the prosecution." *See Jackson*, 443 U.S. at 319. Further, "a federal habeas

corpus court faced with a record of historical facts that supports conflicting inferences must

presume—even if it does not affirmatively appear in the record—that the trier of fact resolved

any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

Here, the evidence as a whole, when viewed in the light most favorable to the State, does

not demonstrate that "no rational trier of fact could have agreed with the jury" that Mr.

Carosiello was guilty of aggravated murder.  *Coleman*, 566 U.S. at 651.  Given this finding, the undersigned concludes that Mr. Carosiello's sufficiency claim is without merit and the Court may therefore end its inquiry.  *See Stewart*, 595 F.3d at 653 (explaining that "[t]he inquiry ends if the [court] determines that there was sufficient evidence to convict [the petitioner]").

Even if this Court were "to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable."  *Brown*, 567 F.3d at 205; *see also White*, 602 F.3d at 710.  Accordingly, in the interest of completeness, the undersigned turns to this question and Mr. Carosiello's challenges to the state court of appeals' sufficiency determination.

### 3.      Whether State Court of Appeals' Sufficiency Determination Was Reasonable

The state court of appeals addressed Mr. Carosiello's sufficiency claim as follows:

{¶ 23} On appeal, Appellant contests only his aggravated murder conviction. Specifically, Appellant was convicted of violating R.C. 2903.01(A), which provides that: "[n]o person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."

{¶ 24} Appellant argues that the state failed to present sufficient evidence that he acted with prior calculation and design. He contends that the record is devoid of any evidence to show that the shooting was planned or that he intended to kill Holly. At best, Appellant argues that the evidence shows that he planned to have a group of friends at his house at the same time that he expected it to be burglarized. He additionally argues that the state failed to present sufficient evidence to rebut the operation of the "castle doctrine" as he understands that doctrine.

{¶ 25} The state responds that the record is replete with evidence that Appellant lured the group to his house while he waited, armed, to ambush them. The state argues that Appellant and his friends waited in a field behind the house for the erstwhile thieves to arrive. The state highlights that Appellant and his friends were armed and deliberately concealed themselves. The state also points to evidence that Appellant maintained contact with Johnny and instructed him to tell the thieves that no one was at home. The state presented testimony that Appellant said that if the group of thieves arrived, he would shoot them. Further, Appellant instructed others

to stay away from the house because he knew the thieves would not attempt to enter if they thought someone was home.

{¶ 26} "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin–McCaffrey*, 186 Ohio App.3d 548, 2010–Ohio–617, 929 N.E.2d 476, ¶ 49 (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper*, 7th Dist. No. 07 JE 45, 2009–Ohio–1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). When reviewing a conviction for sufficiency of the evidence, a reviewing court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci*, 7th Dist. No. 13 MA 34, 2015–Ohio–1882, ¶ 14, citing *State v. Merritt*, 7th Dist. No. 09–JE–26, 2011–Ohio–1468, ¶ 34.

{¶ 27} In reviewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

{¶ 28} The state argues that sufficiency of the evidence is not the proper standard of review when dealing with the "castle doctrine." Citing *State v. Meisel,* 7th Dist. No. 10 MO 4, 2011–Ohio–6426, the state explains that a manifest weight of the evidence standard is more appropriate, as a defendant claiming self-defense does not seek to negate an element of the offense, but instead seeks to relieve himself of culpability. See also *State v. Hogg*, 10th Dist. No. 11AP–50, 2011–Ohio–6454 (because the "castle doctrine" involves an affirmative defense, a manifest weight of the evidence review is more appropriate than a sufficiency of the evidence review).

{¶ 29} While the state is correct, we note that the evidence the state used to show that Appellant did not act in self-defense is the same evidence it used to show that he acted with prior calculation and design. Thus, a finding of prior calculation and design necessarily negates the Appellant's reliance on self-defense.

{¶ 30} The legislature intended the element of "prior calculation and design" to require more than mere instantaneous or momentary deliberation. *State v. Kerr,* 7th Dist. No. 15 MA 0083, 2016–Ohio–8479, ¶ 20. Prior calculation requires evidence "of 'a scheme designed to implement the calculated design to kill' and 'more than the few moments of deliberation permitted in common law interpretations of the former murder statute." *Id.*

38

{¶ 31} When evidence presented at trial "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *Id.*, citing *State v. Braden*, 98 Ohio St.3d 354, 2003–Ohio–1325, 785 N.E.2d 439, ¶ 61.

{¶ 32} An appeal contesting a finding of prior calculation and design is evaluated by looking at the totality of the circumstances on a case-by-case basis. *Kerr* at ¶ 21. Prior calculation and design can be found where a defendant "quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001), citing *State v. Palmer*, 80 Ohio St.3d 543, 567–568, 687 N.E.2d 685 (1997).

{¶ 33} Instead of a bright-line test, Ohio courts analyze several factors to determine if prior calculation and design has been proven. These factors include whether the defendant and victim knew each other, if the relationship was strained, whether the defendant gave thought in choosing the murder weapon or site, and whether the act was drawn out or sprung from an instantaneous eruption of events. *State v. Franklin*, 97 Ohio St.3d 1, 2002–Ohio–5304, 776 N.E.2d 26, ¶ 56–60.

{¶ 34} Neither party disputes that Appellant and Holly knew one another. They were married and had two young children together. The parties also do not dispute that the relationship was strained. Although they were still married, they had been separated for a year and each were both dating other people. The record also contains evidence that there was some animosity between them.

{¶ 35} There is no direct evidence that Appellant "chose" the murder site. It was Holly and her group who had decided to invade Appellant's house. However, despite being made aware that this group intended to burglarize his house, Appellant made no attempt to alert the police. Instead, Appellant went to great effort to make the house appear entirely empty in order to entice the group to return to his home, where he could control the chain of events as they occurred. Appellant directed Johnny to tell Jamie that his house would be empty that night. He moved all the cars to a field behind the house. It is apparent from this record that Appellant lured the group to his house while he waited, armed. In effect, he ensured that his house would be the murder site. He also deliberately armed himself with a .22 caliber handgun after learning the group was on their way.

{¶ 36} As to whether the act was drawn out or instantaneously erupted, the trial court noted that substantial evidence was provided to the jury to demonstrate that the act was drawn out and was not the result of an instantaneous eruption of events:

> The Defendant was in his own home at the time of the offense, but the evidence of prior calculation and design is overwhelming. The Defendant engaged in a comprehensive plan to set up the killing and to then carry it

out. An integral part of the plan included causing others to believe that the Defendant's house was empty because they would not enter an occupied house. Holly Cariosello [sic] was lead [sic] to believe she was entering an empty house. In fact the Defendant was armed and waiting inside. Ultimately, Holly Cariosello [sic] was shot one time through the forehead literally right between her eyes. This fact contradicts the Defendant's version of the events.

(4/13/15 Sentencing Entry, p. 2.)

{¶ 37} The state's case relied on the testimony of several witness, phone records, a series of police interviews, and physical evidence. This evidence shows that Appellant put together a plan where his intent was to kill and that he went to a great deal of effort to ensure its success.

*Enticement*

{¶ 38} The state relied heavily on the fact the Appellant knew that the thieves would not attempt to enter the house if they believed it was occupied. This is evident from the fact that the group abandoned their first two attempts after observing people inside the house. Knowing this, Appellant deliberately created the appearance that the house was empty.

{¶ 39} One of the state's key witnesses was Martina Michael. Martina testified that after Appellant learned of the group's plans, Appellant moved the drugs towards the back of a barn and hid his money. (12/29/15 Trial Tr., p. 742.) He also moved all the cars on the property to a field behind the house.

{¶ 40} Tony corroborated Martina's testimony that Appellant moved all the cars to the field. *Id.* at p. 1094. Tony also testified that Appellant intended to make the house appear to be empty. Stephanie DeRoss testified that Appellant had the phone on speaker, and that she overheard his conversations with Johnny. She specifically heard Appellant tell Johnny to inform the group of thieves that he would be out of the house for a few hours and that his mother and stepfather were out of town for a funeral.

{¶ 41} In addition to his efforts to make the house appear empty, several witnesses testified that Appellant later directed Tony and Brian not to return to the house because he knew the thieves would only return if they believed no one was home. *Id.* at pp. 752, 871, 1098. Martina testified that Appellant instructed her to call Tony and tell him not to come near the house. Tony confirmed that he received this call as he was driving near the house. After receiving Martina's call, he pulled off to the side of the road and waited for further instructions. At one point, he saw a car that he believed was Holly's, and he phoned Appellant with the news that she had just passed him. *Id.* at p. 1098. Roxanne Lucas, Tony's girlfriend, confirmed

Tony's testimony, as did Michael Johnston, a friend of Tony's who was also in the car. *Id.* at p. 1035.

{¶ 42} Stephanie testified that Appellant texted Brian and told him that the thieves were on their way to his house and that Brian should stay away. Brian responded to Appellant: "Kill those m* * * f* * *ers." *Id.* at p. 871. Stephanie saw both texts.

{¶ 43} It is clear from this record that Appellant took great effort to not only lead the would-be thieves to believe that the house was empty, but also to ensure that no one would come to the house and scare them away. There is substantial evidence of record that Appellant lured them to his house.

*Weapons*

{¶ 44} Martina testified that Appellant was armed with two guns, a rifle and a .22 caliber handgun. *Id.* at pp. 748, 864, 1092. This was corroborated by Tony, Stephanie, and Appellant himself. At the time Holly and her group arrived, Appellant admits that he was armed with the .22 caliber handgun. According to Martina and Appellant's testimony, his stepfather was also armed. There is no evidence that any member of the group of thieves was armed or that Appellant had any reason to believe that they were. While Appellant testified that Johnny told him the thieves were trying to find a gun, Johnny denied this assertion.

*Ambush*

{¶ 45} Multiple witnesses testified that Appellant and his friends concealed themselves in the field behind the house as they waited for the group to arrive during the afternoon. Appellant concedes that he was armed with multiple weapons at this time. Appellant maintained contact with Johnny while they waited, to ensure they would be prepared to act when the thieves arrived.

{¶ 46} There is also evidence that Appellant actively assisted the thieves to effect the ambush that night. Jamie testified that he could not kick down the back door, so he and Holly decided that he would lift her to the window for her to climb through. He testified that he attempted to push in an air conditioner unit that blocked the window. At first, he met resistance. Suddenly, the unit slid easily inside without a crash. *Id.* at p. 983. Police found the unit sitting on a plastic tote to the right of the window. There did not appear to be any damage to a variety of items underneath the window, where the unit would have fallen. The state theorized that Appellant realized that Jamie could not push the unit inside because the entertainment center blocked the window, so Appellant pulled the unit inside as Jamie pushed, in order to aid the thieves' entrance into the room.

{¶ 47} Det. Young testified that it appeared as if someone had lifted the air conditioner unit out of the window and placed it on the totes. *Id.* at p. 584. A wooden entertainment center stood directly in front of the window and was about

an inch or so higher than the windowsill. Det. Young opined that this would have made it extremely difficult to push the unit through window. *Id.* at p. 586. Det. Young surmised that this is why Jamie's efforts were initially met with resistance.

{¶ 48} When investigators arrived at the scene, they observed several glass bottles and various items that stood upright on the entertainment center along with an undisturbed large flat screen television. Det. Young testified that it would have been impossible for the air conditioner unit to be pushed inside without knocking over the television set or any of the glass bottles or various items that stood on the entertainment center.

{¶ 49} Additionally, the unit was found lying on a plastic tote with the side that would have been outside of the house face down on the tote. The side that would have remained in the room was facing the ceiling. This positioning would have required the unit to flip over while in the air and coincidentally land directly on the tote to the right of the window. Based on this evidence, the state contended that Appellant assisted in the removal of the unit and then waited, with his gun aimed at the window, while Holly climbed through. In fact, Appellant admits that he waited in his room, armed, while Holly climbed through the window. *Id.* at p. 1294.

{¶ 50} At trial, the state's position was that the testimony of Krista Timm, deputy medical examiner, did not support Appellant's claim that he had been crouched down, and then jumped up and shot wildly at a shadow in the window. She testified there was a single gunshot wound directly between the victim's eyes. *Id.* at p. 1176. In addition, Jamie testified that he and Holly had been talking in a normal tone of voice, as they did not believe anyone was home. It was likely that Appellant, who was inside the small bedroom above the back door, could hear their plans to push the air conditioner through the window so that Holly could climb inside the room. Hence, the evidence shows that Appellant aided the victim's entrance into the house and was waiting there, poised to shoot.

{¶ 51} Considering the facts and circumstance of this case, there is substantial evidence that Appellant acted with prior calculation and design. Although the evidence is largely circumstantial, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Prieto*, 7th Dist. No. 15 MA 0200, 2016–Ohio–8480, ¶ 34, citing *In re Washington*, 81 Ohio St.3d 337, 340, 691 N.E.2d 285 (1998); *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. In fact, "[e]vidence supporting the verdict may be found solely through circumstantial evidence." *State v. Smith*, 7th Dist. No. 06 BE 22, 2008–Ohio–1670, ¶ 49.

{¶ 52} Accordingly, Appellant's first assignment of error is without merit and is overruled.

*Carosiello*, 2017 WL 4548327, at *5-10; (ECF Doc. 7-1, pp. 105-15). Mr. Carosiello attacks the state court of appeals' sufficiency determination (ECF Doc. 17-1, pp. 119-26), arguing: (1) under 28 U.S.C § 2254(d)(1), the state court of appeals' adjudication of his sufficiency claim involved an unreasonable application of *Jackson v. Virginia*, 433 U.S. 307 (1979); (2) under 28 U.S.C. § 2254(d)(2), the state court of appeals' adjudication of his sufficiency claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence; and (3) the state courts' "reasoning that 'a finding of prior calculation and design, negates self-defense' is contrary to Martin v Ohio, 480 U.S. 228 (1987)" (*id.* at pp. 119-20).   For the reasons explained below, the undersigned finds no merit to these arguments.

> **i.  Whether the State Court of Appeals' Sufficiency Determination Involved an Unreasonable Application of *Jackson* Under 28 U.S.C. § 2254(d)(1) or an Unreasonable Determination of Facts in Light of the Evidence Under 28 U.S.C. § 2254(d)(2)**

Mr. Carosiello's argument that the state court of appeals' sufficiency analysis was an "unreasonable" application of *Jackson* under 28 U.S.C § 2254(d)(1) and that its sufficiency determination involved an unreasonable application of facts in light of the evidence under 28 U.S.C. §2254(d)(1) are blended. (ECF Doc. 17-1, pp. 121-26.)  Accordingly, the undersigned addresses these two arguments together.

The *Jackson* sufficiency standard requires consideration of "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. at 319 (emphasis in original).  Mr. Carosiello agrees that the court correctly described the sufficiency of evidence standard and the factors considered by Ohio courts when determining if prior calculation and design have been proven (*id.* at p. 121 (citing ¶¶ 26-28, 30-33 of the court of appeals decision)), but challenges the findings as to two factors.  Specifically, he argues there was not sufficient

43

evidence to find that: (1) Mr. Carosiello "chose" the murder site; or (2) the shooting did not result from an "instantaneous eruption of events." (*Id.* at pp. 121-24.)

Before turning to the state court of appeals' consideration of the two specified factors, the undersigned observes that there is no bright-line test for prior calculation and design. Instead, as the state court of appeals explained, "[a]n appeal contesting a finding of prior calculation and design is evaluated by looking at the totality of the circumstances on a case-by-case basis." (ECF Doc. 7-1, p. 108 ¶ 32 (citing *State v. Kerr*, 2016-Ohio-8479, ¶ 22, 2016 WL 7626278, at *5 (Ohio App. Ct. 2016).)

Additionally, the undersigned observes that the burden to obtain relief under AEDPA is demanding. First, under 28 U.S.C. § 2254(d)(1), "[a] state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Otte*, 654 F.3d at 599–600 (quoting *Williams*, 529 U.S. at 413). "This is a difficult standard for any petitioner to meet." *Id.* at 600. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer*, 538 U.S. at 75. "The state court's application of clearly established law must be objectively unreasonable." *Id.*

Second, under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt*, 571 U.S. at 18. The Sixth Circuit has explained that "[a] state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state

44

court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record[]")(quoting and citing 28 U.S.C. § 2254(d)(2) and § 2254(e)(1)). *Matthews*, 486 F.3d at 889. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt*, 571 U.S. at 18 (internal citations and quotations omitted).

Third, under the second layer of deference applied to federal habeas review of sufficiency claims under AEDPA, the question is not whether this Court finds the state court appeals' determination incorrect, but rather "whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [Mr. Carosiello] guilty beyond a reasonable doubt based upon the evidence introduced at trial." *Brown*, 567 F.3d at 205 (emphasis in original). Mr. Carosiello "'must show that the state court's ruling on [his] [sufficiency] claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby*, 565 U.S. at 24 (quoting *Harrington*, 562 U.S. at 103). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102.

Keeping in mind the high deference afforded state court determinations under AEDPA, the undersigned turns to Mr. Carosiello's specific challenges.

### a. The State Court of Appeals' Finding that Petitioner "Chose" the Murder Site Was Not Unreasonable

As it pertains to the first factor challenged by Mr. Carosiello, the court of appeals found:

{¶ 35} There is no direct evidence that Appellant "chose" the murder site. It was Holly and her group who had decided to invade Appellant's house. However, despite being made aware that this group intended to burglarize his house, Appellant made no attempt to alert the police. Instead, Appellant went to great effort to make the house appear entirely empty in order to entice the group to return to his home, where he could control the chain of events as they occurred. Appellant directed Johnny to tell Jamie that his house would be empty that night. He moved

all the cars to a field behind the house. It is apparent from this record that Appellant
lured the group to his house while he waited, armed. In effect, he ensured that his
house would be the murder site. He also deliberately armed himself with a .22
caliber handgun after learning the group was on their way.

*Carosiello*, 2017 WL 4548327, at *7 (emphasis added); (ECF Doc. 7-1, p. 109.)  Mr. Carosiello

challenges the court's finding that he "ensured that his house would be the murder site," focusing

his arguments on the language underlined above, and argues that the court's determination as to

this factor was unreasonable.  (ECF Doc. 17-1, p. 122.)

He first argues that the state court's finding that "he ensured his house would be the

murder site" was unreasonable given that the state court of appeals initially observed that there

was no direct evidence that he "chose" the murder site.  (ECF Doc. 17-1, p. 122.)  Mr.

Carosiello's argument is unavailing.  While the state court of appeals observed there was a lack

of direct evidence, "[c]ircumstantial evidence alone is sufficient to support a conviction[.]"

*Johnson*, 200 F.3d at 992; *see also Durr*, 487 F.3d at 449 ("circumstantial evidence is entitled to

equal weight as direct evidence").  The state court recognized this principle, explaining:

"Although the evidence is largely circumstantial, circumstantial evidence and direct evidence

inherently possess the same probative value" and "evidence supporting the verdict may be found

solely through circumstantial evidence."  (ECF Doc. 7-1, p. 114, ¶ 51) (internal citations, quotes,

and alterations omitted).  Mr. Carosiello fails to show that the state court of appeals unreasonably

applied *Jackson* by relying on circumstantial evidence to conclude that there was sufficient

evidence to support his conviction for aggravated murder.

Mr. Carosiello next argues that the state court of appeals' decision was an unreasonable

application of *Jackson* because it: (1) unreasonably found he "directed Johnny to tell Jamie that

his house would be empty *that night*," since "no one testified that [his] house would be empty

that 'night.'" (*id*. (emphasis added)); (2) incorrectly found "he moved *all the cars* to a field

behind the house" (*id*. at pp. 122-23 (emphasis added)); (3) infringed on his Second Amendment rights by relying on evidence that he armed himself (*id*. at p. 123); and (4) unreasonably relied on evidence that he did not call the police to find that he "chose" the site because regardless of whether he attempted to call the police, he exercised his constitutional right to arm himself and barricade himself in his home by dead bolting his doors (*id*.).  On these grounds, he argues the evidence "weighs heavily against a finding that [he] 'chose' the site, but rather, it was chosen by a group of conspirators who decided to invade [his] home."  (*Id*. at pp. 123-24.)

As an initial matter, to the extent that Mr. Carosiello's arguments are premised on his claim that the state court of appeals' factual findings are not entitled to a presumption of correctness, as explained in Section III.C., *supra*, Mr. Carosiello has not rebutted the presumption of correctness afforded the state court of appeals' factual findings.

As to his first argument —that no one testified the house would be empty at *that night*— Mr. Carosiello acknowledges his own testimony that he told Johnny Paroda to tell "the burglars that [he] would be gone for a 'couple hours' . . . at 5:00 p.m." and the testimony of Stephanie Deross that "she heard [Mr. Carosiello] tell [Johnny] Paroda to inform the burglars the house would be empty for 'two hours.'"  (ECF Doc. 17-1, p. 122.)  Even testimony that Mr. Carosiello said he would be gone for two hours beginning at 5:00 p.m. would support a finding that he said he would be gone "that night."  Ms. Deross also testified that he "told Johnny to let them [the burglars] know that . . . his parents were going to be out of town to basically look like no one was home, because there was no cars or vehicles or anything."  (ECF Doc. 7-5, p. 229.)  Ms. Michael testified that she heard Mr. Carosiello tell "Johnny that when he talked to Jamie to say that Nick's mom and dad went to a funeral and that Nick and me went with Tony to fix his car." (ECF Doc. 7-5, pp. 161-62.)

47

As to the second argument—that not *all* of the cars were moved to the field—Mr. Carosiello argues the state court findings were wrong because: Ms. Michael testified that his "mother's vehicle was left out front"; Mr. Carosiello's vehicle was right by the back porch, not the field; and his brother testified they "always parked in the back yard and used the back door." (ECF Doc. 17-1, pp. 122-23.)  While Ms. Michael did testify that Mr. Carosiello's mother's car was parked out front, she explained that "it was always there and never moved."  (ECF Doc. 7-5, p. 108.)  She also testified that Mr. Carosiello was upset when his sister pulled in the driveway, and he asked her to "pull her car around back and hide it where he had his cars hidden . . . already in the back of the field."  (*Id*.)  His brother also testified that "[t]he vehicles were in the backyard."  (ECF Doc. 7-6, p. 206.)  Indeed, Mr. Carosiello testified that he hid his vehicle that day "to catch them in the act of trying to break into [his] house at 5:00 in the afternoon."  (ECF Doc. 7-8, p. 97.)

As to the final two arguments—challenging the state court's reliance on evidence that Mr. Carosiello armed himself with a handgun when he learned that people were coming to burglarize his home, without alerting the police—Mr. Carosiello argues he had a right to defend himself by arming himself with a handgun in his home, and that his use of dead bolts on the doors made it "indisputable" he did not "choose" the murder site. (ECF Doc. 17-1, pp. 123-24.) The state court of appeals found, to the contrary, that Mr. Carosiello's actions in enticing others to burglarize his home by making it appear empty, along with his subsequent decision to arm himself and wait for the burglars rather than call the police, were relevant to whether he took part in choosing the murder site.

The sufficiency standard as set forth by the Supreme Court requires that evidence be viewed "in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319, and

"[c]ircumstantial evidence alone is sufficient to support a conviction," *Johnson*, 200 F.3d at 992.

Under this standard, Mr. Carosiello's contention that the state court of appeals' determination is

unreasonable due to a lack of direct evidence is unavailing.  The undersigned cannot find that the

state court of appeals unreasonably applied *Jackson*.  Given the totality of the evidence, the

undersigned also cannot conclude that the state court of appeals' consideration of Mr.

Carosiello's role in choosing the murder site was based on an unreasonable determination in light

of the evidence.

### b.  The State Court of Appeals' Finding that the Shooting Did Not Result From an Instantaneous Eruption of Events Was Not Unreasonable

As to the second factor challenged by Mr. Carosiello, the court of appeals found:

{¶ 36} As to whether the act was drawn out or instantaneously erupted, the trial court noted that substantial evidence was provided to the jury to demonstrate that the act was drawn out and was not the result of an instantaneous eruption of events:

> The Defendant was in his own home at the time of the offense, but the evidence of prior calculation and design is overwhelming. The Defendant engaged in a comprehensive plan to set up the killing and to then carry it out. An integral part of the plan included causing others to believe that the Defendant's house was empty because they would not enter an occupied house. Holly Cariosello [sic] was lead [sic] to believe she was entering an empty house. In fact the Defendant was armed and waiting inside. Ultimately, Holly Cariosello [sic] was shot one time through the forehead literally right between her eyes. This fact contradicts the Defendant's version of the events.

(4/13/15 Sentencing Entry, p. 2.)

{¶ 37} The state's case relied on the testimony of several witness, phone records, a series of police interviews, and physical evidence. This evidence shows that Appellant put together a plan where his intent was to kill and that he went to a great deal of effort to ensure its success.

*Carosiello*, 2017 WL 4548327, at *7; (ECF Doc. 7-1, p. 109-10.)  The state court of appeals then

proceeded to detail evidence it found sufficient to support the jury's verdict, which included

evidence of enticement, weapons, and ambush.  *Carosiello*, 2017 WL 4548327, at *8-9; (ECF Doc. 7-1, p. 110-14.)

First, Mr. Carosiello challenges the court of appeals' determination that the shooting was not the result of an instantaneous eruption of events, but was instead a drawn-out plan.  He argues that the state court of appeals unreasonably applied the *Jackson* standard because it considered the trial court's statements regarding the evidence made during sentencing rather than conducting its own *de novo* analysis of the evidence.  (ECF Doc. 17-1, pp. 124-26.)  The undersigned disagrees.  The state court of appeals did not rely solely on the trial court's sentencing entry.  That was but one portion of the trial court record cited by the state court of appeals in support of its sufficiency determination.  The court, following its reference to the trial court's sentencing entry, also considered evidence presented at trial.  (ECF Doc. 7-1, pp. 110-14.)  Accordingly, the undersigned finds the state court of appeals did not unreasonably apply *Jackson* when it quoted the trial court's summary of evidence at trial.

Second, Mr. Carosiello argues the state court of appeals' determination as to this factor was unreasonable because it infringed on his Second Amendment rights by considering evidence that he armed himself with a weapon.  (ECF Doc. 17-1, p 125 (citing ¶ 44 of court of appeals' decision).)  The undersigned finds Mr. Carosiello has not shown that the court's consideration of evidence that he possessed the weapon he used in a fatal shooting infringes his Second Amendment rights or was contrary to clearly established federal law.  The state court of appeals considered and addressed Mr. Carosiello's claim of self-defense (ECF Doc. 7-1, pp. 100-04, 116-26) and "the Supreme Court has never held that the Second Amendment justifies murder . . ., or that it creates a broader standard for self-defense then provided by state law," *Sanders v. Rivard*, No. 4:12-CV-15122, 2014 WL 2931460, at *5 (E.D. Mich. June 30, 2014).

Third, Mr. Carosiello takes issue with the state court of appeals' finding that the evidence sufficiently supported the State's theory that he assisted the burglars in removing the air conditioning unit.  (ECF Doc. 17-1, pp. 125-26.)  He argues this theory is unreasonable, even when viewing the evidence in the light most favorable to the prosecution (*id*. at p. 125), and contends that his version of the events relating to the air conditioner is supported by the evidence (*id*. (referring to ECF Doc. 17-1, pp. 96-102)).  He argues it was "impossible" for him to remove the air conditioner from the window without three burglars who were on the opposite side of the window knowing what he was doing (*id*. at p. 125), and asks why he would "take the extra step of dead bolt locking [his] doors" if he "so desperately wanted the intruders to get into [his] home so that [he] could kill them (*id*. at pp. 125-26).  The state court considered the evidence relating to the air conditioner when assessing the sufficiency of the evidence, explaining:

{¶ 46} There is also evidence that Appellant actively assisted the thieves to effect the ambush that night. Jamie testified that he could not kick down the back door, so he and Holly decided that he would lift her to the window for her to climb through. He testified that he attempted to push in an air conditioner unit that blocked the window. At first, he met resistance. Suddenly, the unit slid easily inside without a crash. *Id.* at p. 983. Police found the unit sitting on a plastic tote to the right of the window. There did not appear to be any damage to a variety of items underneath the window, where the unit would have fallen. The state theorized that Appellant realized that Jamie could not push the unit inside because the entertainment center blocked the window, so Appellant pulled the unit inside as Jamie pushed, in order to aid the thieves' entrance into the room.

{¶ 47} Det. Young testified that it appeared as if someone had lifted the air conditioner unit out of the window and placed it on the totes. *Id.* at p. 584. A wooden entertainment center stood directly in front of the window and was about an inch or so higher than the windowsill. Det. Young opined that this would have made it extremely difficult to push the unit through window. *Id.* at p. 586. Det. Young surmised that this is why Jamie's efforts were initially met with resistance.

{¶ 48} When investigators arrived at the scene, they observed several glass bottles and various items that stood upright on the entertainment center along with an undisturbed large flat screen television. Det. Young testified that it would have been impossible for the air conditioner unit to be pushed inside without knocking over

the television set or any of the glass bottles or various items that stood on the entertainment center.

{¶ 49} Additionally, the unit was found lying on a plastic tote with the side that would have been outside of the house face down on the tote. The side that would have remained in the room was facing the ceiling. This positioning would have required the unit to flip over while in the air and coincidentally land directly on the tote to the right of the window. Based on this evidence, the state contended that Appellant assisted in the removal of the unit and then waited, with his gun aimed at the window, while Holly climbed through. In fact, Appellant admits that he waited in his room, armed, while Holly climbed through the window. *Id.* at p. 1294.

{¶ 50} At trial, the state's position was that the testimony of Krista Timm, deputy medical examiner, did not support Appellant's claim that he had been crouched down, and then jumped up and shot wildly at a shadow in the window. She testified there was a single gunshot wound directly between the victim's eyes. *Id.* at p. 1176. In addition, Jamie testified that he and Holly had been talking in a normal tone of voice, as they did not believe anyone was home. It was likely that Appellant, who was inside the small bedroom above the back door, could hear their plans to push the air conditioner through the window so that Holly could climb inside the room. Hence, the evidence shows that Appellant aided the victim's entrance into the house and was waiting there, poised to shoot.

*Carosiello*, 2017 WL 4548327, at *9; (ECF Doc. 7-1, p. 112-14.)

The state court of appeals was presented with and considered the evidence that Mr. Carosiello contends shows impossibility, but found the evidence did not support his theory. Mr. Carosiello contends that the state court of appeals' factual findings were unreasonable in light of the evidence, but has not rebutted the state court of appeals' factual findings by clear and convincing evidence or shown that the state court's findings lacked evidentiary support. The Court "must . . . defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205; *see also White*, 602 F.3d at 710. The sufficiency standard as set forth by the Supreme Court requires that evidence be viewed "in the light most favorable to the prosecution[.]" *Jackson*, 443 U.S. at 319. Additionally, "[c]ircumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson*, 200 F.3d at 992 (internal

citations, quotations, and alterations omitted).  The undersigned cannot find that the state court of appeals unreasonably applied *Jackson*.  Given the totality of the evidence, the undersigned also cannot find the state court of appeals' finding that the shooting did not result from an instantaneous eruption of events was an unreasonable determination in light of the evidence.

For the reasons explained, the undersigned does not find under 28 U.S.C. § 2254(d)(1) that the state court of appeals unreasonably applied *Jackson* when it found there was sufficient evidence upon which a jury could find prior calculation and design and convict Mr. Carosiello of aggravated murder.  Further, the undersigned does not find under 28 U.S.C. § 2254(d)(2) that the state appellate court's finding of sufficient evidence to support the conviction of aggravated murder was based on an unreasonable determination of facts in light of the evidence.

### ii. Whether Court of Appeals' Sufficiency Determination was Contrary to *Martin v. Ohio*

Mr. Carosiello also argues that the state court of appeals' sufficiency determination was contrary to clearly established law set forth in *Martin v. Ohio* because the court adjudicated his claim based on a belief that "a finding of prior calculation and design necessarily negates the Appellant's reliance on self-defense."  (ECF Doc. 17-1, pp. 120, 121 (citing ¶ 29 of the state court of appeals' decision).)  He asserts that "[t]his blanket theory means that as long as the state uses the same body of evidence to prove the element of prior calculation and design as it uses to disprove self-defense, then if prior calculation and design is proven, self-defense can never exist."  (*Id.* at p. 120.)  He says this is contrary to *Martin*, which "stands for the proposition that the elements of aggravated murder and self-defense do not 'impermissibly overlap[,]'" meaning "the two are independent of each other, and not only can, but are designed to co-exist."  (*Id.* (citing paragraph two of the *Martin* syllabus).)  He further argues: "The Martin Court clearly held that self-defense carries more weight tha[n] the elements of the crime because 'a killing will

be excused if self-defense is satisfactorily established even if there is no reasonable doubt in the

jury's mind that the defendant is guilty.'" (*Id.* (citing paragraph two of the *Martin* syllabus, also

at 234).)

The *Martin* Court addressed the question: "whether the Due Process Clause of the

Fourteenth Amendment forbids placing the burden of proving self-defense on the defendant

when . . . charged by the State of Ohio with committing the crime of aggravated murder," which

was "defined . . . as 'purposefully, and with prior calculation and design, caus[ing] the death of

another.'" *Martin*, 480 U.S. at 230 (quoting Ohio Rev. Code § 2903.01 (1982)) (brackets in

original). The jury in *Martin* was instructed that they must find "each of the elements of the

crime of aggravated murder ha[d] been proved by the State beyond a reasonable doubt, and that

the burden of proof with respect to those elements did not shift." *Id.* at p. 233. However, the

jury was also told "it could acquit if it found by a preponderance of the evidence that" the

defendant had established the elements of self-defense under Ohio law. *Id.* Given those separate

instructions, the Court found the conviction "did not violate the Due Process Clause." *Id.*

The *Martin* court explained that the jury's verdict reflected two separate findings as to the

self-defense evidence. First, it reflected a finding that that "none of [the defendant's] self-

defense evidence raised a reasonable doubt about the State's proof that she purposefully killed

with prior calculation and design." *Id.* Second, the verdict reflected a finding that the defendant

had "failed" to "justify the killing and show herself to be blameless by proving that she acted in

self-defense." *Id.* By way of contrast, the *Martin* Court suggested that the conviction would run

afoul of due process "if the jury had been instructed that self-defense evidence could not be

considered in determining whether there was a reasonable doubt about the State's case, i.e., that

self-defense evidence must be put aside for all purposes unless it satisfied the preponderance standard." *Id.* at 233-34.

Here, Petitioner argues the court of appeals acted contrary to *Martin* when it said: "a finding of prior calculation and design" in this case "necessarily negate[d] [Mr. Carosiello]'s reliance on self-defense." (ECF Doc. 7-1, p. 107, ¶ 29.)  That statement was made in response to the State's argument that a manifest weight of the evidence standard was the appropriate standard of review when addressing the "castle doctrine" because "a defendant claiming self-defense does not seek to negate an element of the offense, but instead seeks to relieve himself of culpability." (*Id.* at pp. 107, ¶¶ 28-29.)  Mr. Carosiello does not challenge the court of appeals' findings regarding the manifest weight of the evidence in this Petition. (*See* ECF Doc. 17-1, p. 121 ("Manifest weight is an issue of state law and is not cognizable in this forum" and "I will not waste the Court[']s time by addressing [the manifest weight] section" of the court of appeals' decision.).)  After making the challenged comments, the state court of appeals went on to assess whether there was sufficient evidence to support the conviction for aggravated murder (ECF Doc. 7-1, pp. 107-15) and to evaluate Mr. Carosiello's claim of self-defense in light of the evidence presented at trial (*id*. at pp. 115-26).

While the state court of appeals did note that there is some overlap in the evidence and analyses applied to the assessment of "prior calculation and design" and "self-defense" (ECF Doc. 7-1, p. 107, ¶ 29), the court did *not* find—as necessary to conflict with *Martin*—that "self defense could not be considered in determining whether there was a reasonable doubt about the State's case." *Martin*, 480 U.S. at 233.  Under AEDPA, the standard for evaluating state court decisions is "highly deferential" and AEDPA demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010).  Given the high deference

afforded to state court decisions under AEDPA, the undersigned finds no merit to Mr. Carosiello's claim that the court of appeals' sufficiency determination was contrary *Martin*.

Applying the doubly deferential standard for sufficiency of the evidence claims, the undersigned finds no merit to the claim in Ground One of the Petition. The evidence as a whole, when viewed in the light most favorable to the State, does not show that "no rational trier of fact could have agreed with the jury" that Mr. Carosiello was guilty of aggravated murder. *Coleman*, 566 U.S. at 651. Even if this Court were to find that a rational trier of fact could not have found petitioner guilty beyond a reasonable doubt, the undersigned finds that deference is due to court of appeals' sufficiency determination because it was not unreasonable. *Brown*, 567 F.3d at 205.

For the reasons set forth above, the undersigned finds the state court of appeals' sufficiency determination was not an unreasonable application of *Jackson*, was not based on an unreasonable determination of facts in light of the evidence, and was not contrary to *Martin*. Accordingly, the undersigned recommends that the Court **DENY** Ground One of the Petition.

## E.      Ground Two

Mr. Carosiello argues in Ground Two that federal habeas relief is warranted because his trial counsel were ineffective due to their failure to: (1) call witnesses Patty Lewis, Brian Specht, private investigator Joe Rice, and Jim Watson to testify; (2) interview defense witnesses Brain Specht, Patty Lewis, Jim Watson, and private investigator Joe Rice; (3) use investigator Rodger Lanaghan, who was hired with court approved funds; (4) collect police reports to establish the victim and her co-conspirators patterns of stalking and harassing Petitioner; and (5) investigate the crime scene and familiarize themselves with the layout of the house and property. (ECF Doc. 1 p. 6; EFC Doc. 17-1, pp. 127-49.) Mr. Carosiello asserts that he presented these claims in his state court petition for post-conviction relief because they were based on evidence outside the

record and the trial court incorrectly denied the claims as barred by *res judicata*.  (ECF Doc. 17-1, pp. 127-31.)  He further asserts that he exhausted the claims by appealing that denial to the state court of appeals and Supreme Court of Ohio.  However, because his appeal involved a claim that the trial court improperly applied *res judicata*, he argues this Court should decide his ineffective assistance of counsel claims *de novo* because the state court never adjudicated those claims on the merits.  (*Id.*)  Respondent argues in response that Ground Two is without merit.[3]  (ECF Doc. 7, pp. 32-46; ECF Doc. 18.)

The Court first turns to whether the state court adjudicated the five claims of ineffective assistance of counsel in Ground Two "on the merits."  The Supreme Court clarified the meaning of "on the merits" in *Harrington v. Richter*, 562 U.S. 86 (2011).  *Harrington*, 562 U.S. at 98-100; *see Stermer v. Warren*, 959 F.3d 704, 722 (6th Cir. 2020).  The court explained: "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington*, 562 U.S. at 99.  Under this standard, "unless there is a good reason for a federal court to think a state court's decision was *not* on the merits, the federal court must assume it *was* on the merits and apply § 2254(d)."  *Stermer*, 959 F.3d at 722 (emphasis in original).  The presumption that a state court decision was adjudicated on the merits can only be overcome "when there is reason to think some other explanation for the state court's decision is more likely."  *Id.* (citing *Harrington*, 562 U.S. at 99-100).

In Mr. Carosiello's underlying state court proceedings, he filed two petitions to vacate or set aside judgment of conviction or sentence, asserting ineffective assistance of trial counsel.

---

[3] Respondent also argues that certain ineffective assistance of counsel claims may be procedurally defaulted.  However, as shown in the following discussion relative to Ground Two, the ineffective of assistance of trial counsel claims that were deemed barred by *res judicata* in state court are not presented as claims in Ground Two.  (ECF Doc. 7, pp. 42-45.)  Therefore, it is not necessary for the Court to address those particular claims.

(ECF Doc. 7-1 pp. 192-94, 232-37.)  The first petition was filed on January 23, 2017 (ECF Doc. 7-1 pp. 192-94) and the trial court found that it lacked jurisdiction to determine the petition because Petitioner's direct appeal was pending (*id*. at 195).  On April 12, 2018, Petitioner filed the second petition after his direct appeal concluded.  (*Id*. at pp. 232-37.)  He alleged ineffective assistance of trial counsel, asserting that his trial counsel:

> failed to call witnesses; failed to interview State and defense witnesses prior to trial; failed to utilize the private investigator they had hired with Court funds; failed to hire a balistics expert; did not request an immunity hearing pursuant to the Castle doctrine; did not collect police reports to establish the victim's pattern of stalking me; did not investigate the crime scene to familiarize themselves with the layout of the house; did not hire an expert witness to determine plausibility of the A/C unit having being pushed into the room and fallen; did not file for change of venue; did not file motion to have allowed the police interview and Grand Jury testimony provided by Rich Lewis, who was an eyewitness at the scene of the crime, but passed away before the commencement of trial.

(*Id*. at pp. 233-34 (emphasis added).)  In support of his petition, he attached only his own affidavit, restating that he felt his trial counsel was ineffective for the reasons listed in the petition.  (*Id*. at pp. 234, 236-37.)  He asserted that he did not attach evidence supporting his claim for relief because he "need[ed] the assistance of an attorney and investigator to produce the evidence."  (*Id*. at p. 234 (referencing a motion for expert assistance and appointment of counsel filed with his petition).)

On May 22, 2018, the trial court denied Petitioner's petition to vacate or set aside the judgment of conviction or sentence, finding it "barred by res judicata" and denying it summarily without a hearing.  (ECF Doc. 7-1 p. 239.)  Petitioner filed an appeal with the state court of appeals (*id*. at pp. 241-44), which affirmed the denial of the petition (*id*. at pp. 267-78).  The court of appeals found the "major deficiency" with his petition was that "it provide[d] no support for the claims asserted and provide[d] no evidence" and "the allegations appear to be merely a desire for further discovery."  (*Id*. at p. 274.)  The court explained more specifically:

{¶ 24} For instance, Appellant asserts trial counsel was ineffective for failing to call witnesses, specifically in the affidavit attached to his 2018 petition he asserts his mother and Brian Specht should have been called. While failure to call a witness is a proper issue for postconviction relief petition, Appellant does not explain what their testimony would be and how it would have impacted the result of the trial. A postconviction petition should not be used for a mere desire for further discovery. Similarly, his claims for failure to interview witnesses, utilize a private investigator, hire a ballistics expert, obtain police reports on the victim stalking Appellant, and investigate the crime scene may be proper issues for a postconviction petition. However, Appellant does not expound on these claims to indicate how they would have impacted his trial. For example, Appellant admitted to shooting at the window where the victim was coming through it. It is unclear what testimony or opinion an expert witness on ballistics would have that would alter the fact that Appellant shot at the victim. Or, how that opinion would alter the evidence that Appellant enticed the would-be thieves to his house under the belief that it was not occupied.

(*Id.*) The court of appeals also found that certain of Mr. Carosiello's other claims of ineffective assistance of counsel—for failing to request an immunity hearing, failing to argue change of venue, and failing to request grand jury transcripts—were speculative and barred by *res judicata* because those claims were evident from the record and could be raised in a direct appeal without reliance on matters outside the record. (*Id.* at pp. 274-76.) Following the denial of his petition, Mr. Carosiello sought review in the Supreme Court of Ohio (*id.* at pp. 279-305), which declined jurisdiction on October 15, 2019 (*id.* at p. 306).

Returning to the *Harrington* standard, the presumption that a state court decision was adjudicated on the merits can be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." 562 U.S. at 99-100. Here, the court of appeals found the claims upon which he now seeks federal habeas relief were unsupported because he failed to show how the evidence he claimed his trial counsel failed to develop would have impacted his trial. (ECF Doc. 7-1 p. 274.) The only claims the court of appeals found barred by *res judicata*—failing to request an immunity hearing, failing to argue change of venue, and failing to request grands jury transcripts (ECF Doc. 7-1 pp. 275-76)—are not reasserted in

59

this federal habeas petition. Thus, the court of appeals' affirmation of the trial court denial was not based on *res judicata* with respect to the claims asserted in Ground Two of the Petition. Petitioner acknowledged this in the memorandum in support of jurisdiction which he filed with the Supreme Court of Ohio, stating:

> To the credit of the Seventh District, unlike the trial court it reviewed each claim independently – including whether any of the claims were subject to res judicata. To that end, the appellate court found that only the fifth, ninth and tenth claims should have been raised in Appellant's direct appeal and are therefore barred by res judicata.

(ECF Doc. 7-1 p. 288.)

Considering the foregoing, the undersigned finds the state court of appeals adjudicated all claims asserted om Ground Two on the merits. Accordingly, Mr. Carosiello's second ground for relief is not subject to *de novo* review. Rather, the Court must consider the state court of appeals' determination of the claims asserted in Ground Two and apply AEDPA's deference to that determination.

In *Strickland v. Washington*, the Supreme Court set forth two requirements to establish that an attorney was constitutionally ineffective. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). First, a petitioner must demonstrate "that counsel's performance was deficient," which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. In such cases, the petitioner must show that the representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id*. at 688. "Judicial scrutiny of counsel's performance must be highly deferential [because] [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular

act or omission of counsel was unreasonable." *Id.* 689.  Second, a petitioner must demonstrate

"that the deficient performance prejudiced the defense." *Id.* at 687.  "This requires showing that

counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is

reliable." *Id.*  To meet this requirement, "[t]he defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine

confidence in the outcome."

     The court of appeals found no merit to Mr. Carosiello's claim that his trial counsel was

ineffective on the grounds now asserted in Ground Two of the Petition, explaining:

> {¶ 24}  <u>The major deficiency with Appellant's petition is that it provides no support
> for the claims asserted and provides no evidence; the allegations appear to be
> merely a desire for further discovery</u>. For instance, Appellant asserts trial counsel
> was ineffective for failing to call witnesses, specifically in the affidavit attached to
> his 2018 petition he asserts his mother and Brian Specht should have been called.
> <u>While failure to call a witness is a proper issue for a postconviction relief petition,
> Appellant does not explain what their testimony would be and how it would have
> impacted the result of the trial</u>. A postconviction petition should not be used for a
> mere desire for further discovery. <u>Similarly, his claims of failure to interview
> witnesses, utilize a private investigator</u>, hire a ballistics expert, <u>obtain police reports
> on the victim stalking Appellant</u>, and investigate the crime scene <u>may be proper
> issues for a postconviction relief petition</u>. However, <u>Appellant does not expound
> on these claims to indicate how they would have impacted his trial</u>. For example,
> Appellant admitted to shooting at the window where the victim was coming through
> it. It is unclear what testimony or opinion an expert witness on ballistics would have
> that would alter the fact that Appellant shot at the victim. Or, how that opinion
> would alter the evidence that Appellant enticed the would-be thieves to his house
> under the belief that it was not occupied.
>
>     \*\*\*
>
> {¶ 26}  Without any expansion on the arguments <u>it is pure speculation as to whether
> counsel's performance was deficient and what the effect of the alleged
> ineffectiveness had on the outcome of the trial.</u> Pure speculation is not enough to
> warrant the granting of a petition for postconviction relief.

(ECF Doc. 7-1, pp. 274-75 (emphasis added).)  Where, as in this case, a state court of appeals

has reached the merits of the ineffective-assistance of counsel claim, federal habeas courts

provide AEDPA deference to that adjudication under § 2254(d).  *Perkins v. McKee*, 411 Fed.

Appx. 822, 828 (6th Cir. 2011).  There is no *de novo* review of the evidence.[4]  In *Harrington*, the

Supreme Court emphasized the double layer of deference that federal courts must give state

courts in reviewing *Strickland* claims under AEDPA:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner
> must show that the state court's ruling on the claim being presented in federal court
> was so lacking in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded disagreement.
> . . . An ineffective-assistance claim can function as a way to escape rules of waiver
> and forfeiture and raise issues not presented at trial, and so the *Strickland* standard
> must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the
> integrity of the very adversary process the right to counsel is meant to serve. . . .
> Federal habeas courts must guard against the danger of equating unreasonableness
> under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies,
> the question is not whether counsel's actions were reasonable. The question is
> whether there is any reasonable argument that counsel satisfied *Strickland's*
> deferential standard.

*Perkins*, 411 Fed. Appx. at 828 (quoting *Harrington,* 131 S.Ct. 770, 786-788) (emphasis added)).

Mr. Carosiello has not shown that the court of appeals' determination—that it was "pure

speculation" whether counsel's performance was deficient and how the alleged ineffectiveness

affected on the outcome at trial—was contrary to or an unreasonable application of *Strickland*.

He has not shown that the court of appeals' decision was "so lacking in justification that there

was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement."  *Id.*

Considering the double layer of deference and Mr. Carosiello's failure to show that the

state court of appeals' decision was contrary to or an unreasonable application of clearly

established federal law or based on an unreasonable determination of the facts in light of the

---

[4] Mr. Carosiello's assertion that this Court should consider his claims of ineffective assistance of counsel not solely
on the basis of the record before the state court, but *de novo* and based on evidence not before the state court has
previously been considered and found by this Court to be unavailing.  (ECF Doc. 28, pp. 11-12.)  Upon full review
of the record, the undersigned continues to find the argument unavailing under *Pinholster*, 563 U.S. 170.

evidence presented in the State court proceeding, the undersigned recommends that the Court

**DENY** Ground Two of the Petition.

## F.     **Grounds Three and Four**

In Grounds Three and Four, Mr. Carosiello raises challenges relating to his claim that he

acted in self-defense.  In Ground Three, he argues his conviction for aggravated murder violated

his constitutional right to a jury verdict "beyond a reasonable doubt." (ECF Doc. 1, p. 8; ECF

Doc. 1-2, p. 1; ECF Doc. 17-1, pp. 150-208.)  He explains that his argument "is in essence a

challenge to the constitutionality of Ohio Revised Code §2901.05(B)," but argues that "the error

itself manifest[s] in the form of a jury instruction." (ECF Doc. 17-1, p. 154.)  His challenge to

the constitutionality of Ohio Revised Code § 2901.05(B) centers on "the standard of proof

required for the State to rebut the 'Castle Doctrine' presumption of self-defense." (*Id*. at p. 173.)

While the statute requires the presumption to be rebutted "by a preponderance of the evidence,"

Mr. Carosiello argues the "Fifth and Fourteenth Amendments right to due process and the Sixth

Amendment right to a jury verdict, require the standard of proof to be beyond a reasonable

doubt." (*Id*. at pp. 173-74.)  He argues that a reasonable doubt standard applies because "the

rebuttal of Ohio's 'castle doctrine' presumption of self-defense is a fact necessary" for

conviction.  (ECF Doc. 1-2, p. 1; ECF Doc. 17-1, p. 208.)  He further requests that "the Court not

extend the Supreme Court ruling in Martin v. Ohio, 480 U.S. 228 to this radically different

situation." (*Id*. at p. 208.)

In Ground Four, Mr. Carosiello recognizes that there is no existing substantive right to

self-defense under the Constitution, but asks this Court to "establish this Constitutional right

under a narrow and specific set of circumstances: defense of home, family, and self, against an

unlawful intruder, using a firearm." (ECF Doc. 17-1, p. 209.)  He believes that this substantive

right should be found to exist under the Second Amendment or the Privileges and Immunities clause of the Fourteenth Amendment.  (ECF Doc. 1, p. 9; ECF Doc. 1-2, p. 1; ECF Doc. 17-1, pp. 208-22.)  Upon establishing this new constitutional right, Mr. Carosiello asks this Court to specifically find that the burden of proof is on the state "to prove absence of self-defense, defense of home, and defense of another, *beyond a reasonable doubt*," and to further find that the standard under O.R.C. § 2901.05(B) "violate[d] [his] right to Due Process under the Fourteenth Amendment, and right to a jury verdict of 'beyond a reasonable doubt,' under the Sixth Amendment."  (*Id.* at pp. 221-22 (emphasis added).)

With respect to his claims in both Grounds Three and Four, Mr. Carosiello concedes that neither claim was presented in state court and both are procedurally defaulted.  (ECF Doc. 1, p. 10; ECF Doc. 17-1, pp. 154-55, 210.)  However, he argues both defaults should be excused due to the "novelty" of his asserted legal arguments.  (ECF Doc. 1, p. 10; ECF Doc. 17-1, pp. 155-75, 210-15.)  He also argues the Court should consider both claims *de novo* and apply his novel legal arguments retroactively.  (ECF Doc. 17-1, pp. 176-208, 215-22.)

Respondent argues that "[i]t is not the function of federal courts in adjudicating federal habeas claims to make up constitutional law as [Petitioner] requests in grounds three and four," and further that this Court should not "simply overrule *Martin v. Ohio*, 480 U.S. 228 (1987)." (ECF Doc. 7, p. 46.)   Respondent observes that there is no "constitutional right to self-defense," and therefore state self-defense law applies.  (ECF Doc. 18, p. 4.)  Respondent also notes that the state court of appeals considered certain "castle doctrine" arguments made by Mr. Carosiello and found them to be without merit.  (*Id.*)

The undersigned will first address Mr. Carosiello's arguments to excuse his procedural defaults based on the "novelty" of his claims, and then address the merits of the claims.  For the

reasons set forth below, the undersigned concludes the claims in Grounds Three and Four of the Petition should be dismissed based on procedural default and/or denied on their merits.

### 1.     Grounds Three and Four are Procedurally Defaulted

Mr. Carosiello admits that the legal claims asserted in Grounds Three and Four of the Petition were not presented to the state courts, and were procedurally defaulted as a result.  (ECF Doc. 17-1, pp. 154-55, 210.)  Nevertheless, he argues that he can demonstrate "cause and prejudice" to excuse the procedural defaults because: his legal arguments are "novel"; applying those arguments would undermine confidence in the outcome of his trial; and the new rules he seeks would qualify for retroactive application.  (*Id.* at pp. 156-76, 210-15; ECF Doc. 1, p. 10.)

One way to overcome procedural default is to show "cause" for the default and demonstrate that "actual prejudice" resulted from the alleged violation of federal law. *See Coleman*, 501 U.S. at 750; *Maupin*, 785 F.2d at 138.  To establish cause, a petitioner must point to "something external . . . that cannot be fairly attributed to him" and "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Mr. Carosiello argues "cause" is established in this case because of the "novelty" of his legal claims, as contemplated in *Reed v. Ross*, 468 U.S. 1 (1984).

The jury instructions challenged in *Reed* gave the defendant in a first-degree murder prosecution the burden to prove his own lack of malice.  *Reed*, 468 U.S. at 3.  Six years after his conviction, the U.S. Supreme Court struck down—as violative of due process—the requirement that defendants prove their own lack of malice.  *Id.* (citing *Mullaney v. Wilbur*, 421 U.S. 684 (1975)).  Two years later, the U.S. Supreme Court held that the *Mullaney* ruling had retroactive application.  *Id.* (citing *Hankerson v. North Carolina*, 432 U.S. 233 (1977)).  Given those

rulings, the parties in *Reed* stipulated that the petitioner had "suffered 'actual prejudice' as a result of the trial court's instruction imposing on him the burden of proving . . . lack of malice." 468 U.S. at 12.  Thus, the only question before the *Reed* court was "whether there was 'cause' for [the petitioner's] failure to raise the Mullaney issue on appeal."  *Id.*

The *Reed* court observed that a "failure to raise a claim for which there was no reasonable basis in exiting law d[id] not seriously implicate any of the concerns that might otherwise require deference to a State's procedural bar," and therefore held: "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures."  468 U.S. at 15-16. However, the *Reed* court confined the application of this standard to situations where the Supreme Court "*has articulated* a constitutional principle that had not been previously recognized but which *is held* to have retroactive application."  *Id.* at 17 (emphasis added).

The situation in this case is distinct.  The *Reed* court found "cause" based on new retroactively-applied Supreme Court precedent that disproved a practice the Supreme Court had arguably sanctioned in prior cases, which was "sufficiently novel" at the time of the conviction "to excuse [the petitioner's] attorney's failure to raise the . . . issue at that time."  468 U.S. at 17-20.  Sixth Circuit courts applying *Reed* have also addressed allegedly "novel" claims based on new Supreme Court precedent.  *See, e.g., Benton v. Brewer*, 942 F.3d 305 (6th Cir. 2019) (assessing "cause" based on application of *Lafler v. Cooper*, 566 U.S. 156 (2012)); *Cvijetinovic v. Eberlin*, 617 F.3d 833 (6th Cir. 2010) (assessing "cause" based on application of *Blakely v. Washington*, 542 U.S. 296 (2004)).

Here, there is no recent Supreme Court precedent articulating the new constitutional standards Mr. Carosiello seeks to apply in Grounds Three and Four, let alone precedent applying

those standards retroactively.  Instead, Mr. Carosiello asserts that his arguments are wholly novel, having not yet been ruled upon by any court (ECF Doc. 17-1, pp. 160-70, 210-13), and seeks a finding that his novel arguments should be adopted and retroactively applied (*id.* at pp. 176-82, 215).  The *Reed* standard does not support a finding of "cause" where the Supreme Court has not yet articulated "a new constitutional rule, representing a clear break from the past," 468 U.S. at 17 (internal citation and quotation marks omitted), and Mr. Carosiello has not identified authority to support such a significant extension of the cause and prejudice exception.  Indeed, if procedural default were excused every time a petitioner asserted a "novel" constitutional argument—regardless of whether that new constitutional interpretation was adopted and made retroactive by the Supreme Court—the exception to procedural default could swallow the rule, undermining the statutory requirements that federal habeas petitioners must fairly present their claims to the state courts and exhaust all available remedies.  *See* 28 U.S.C. § 2254(b), (c)

"For novelty to amount to cause," the Sixth Circuit observed that "the bar is a high one." *Benton*, 942 F.3d at 307.  Here, Mr. Carosiello is not seeking relief based on a new constitutional rule established by the Supreme Court, but requesting that this Court announce a new substantive constitutional rule in the first instance.  For the reasons set forth above, the undersigned finds that Mr. Carosiello has not met his burden to show cause and prejudice excuse the procedural default of the claims in Grounds Three and Four.  Accordingly, the undersigned recommends that the Court **DISMISS** Grounds Three and Four of the Petition with prejudice.

## 2.  Grounds Three and Four Fail on the Merits

As to the merits of the claims in Grounds Three and Four of the Petition, it is observed first that the state court of appeals adjudicated the merits of Mr. Carosiello's prior argument that the Ohio "castle doctrine" establishes "a defendant who uses deadly force to expel a person who

is unlawfully in his home is always presumed to have acted in accordance with the doctrine."

*Carosiello*, 2017 WL 4548327, at *3 (Ohio App. Ct. Oct. 5, 2017); (ECF Doc. 7-1, p. 100).  In

addressing this argument, the court explained:

> {¶ 16} At oral argument, Appellant argued that the state cannot defeat the presumptions within the "castle doctrine" by showing that the traditional self-defense elements were not satisfied. Instead, Appellant argues that this doctrine was intended to stand alone, and that a defendant who uses deadly force to expel a person who is unlawfully in his home is always presumed to have acted in accordance with the doctrine. Appellant urges that the only way the presumption of self-defense found in this doctrine can be defeated is by proof on the part of the state that the victim was lawfully inside the defendant's home. Appellant hinges his entire appellate brief on this presumption.

> {¶ 17} Traditionally, the defense of self-defense requires a defendant to prove by a preponderance of the evidence that (1) he was not at fault in creating the situation, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the force used, and (3) he did not violate a duty to retreat or to avoid the danger. *State v. Goff*, 128 Ohio St.3d 169, 2010–Ohio–6317, 942 N.E.2d 1075, ¶ 36, quoting *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997); R.C. 2901.05. Although this traditional view of self-defense itself is not codified, several self-defense theories, including the "castle doctrine," are found within Chapter 2901 of the Revised Code.

> {¶ 18} The "castle doctrine" is described within R.C. 2901.09(B):

>> For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another.

> This statute, creates an exception to the third element of self-defense, the duty to retreat. *State v. Edwards*, 1st Dist. No. C–110773, 2013–Ohio–239, ¶ 6.

> {¶ 19} R.C. 2901.05(B)(1) extended this doctrine:

>> [A] person is presumed to have acted in self defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering,

or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.

So while R.C. 2901.05(B)(1) must be read in context with the rest of section 2901.05 and cannot be read in a vacuum, this statute has created an additional presumption that a defendant who uses deadly force against a person unlawfully in the defendant's home is presumed to have acted in accordance with the castle doctrine. *State v. Bond*, 6th Dist. No. WD–15–070, 2016–Ohio–8383, ¶ 40.

{¶ 20} <u>Appellant argues that the state can rebut the presumption of the "castle doctrine" only by raising evidence that the victim had a legal right to enter the defendant's residence. He maintains that his own conduct during the incident is not at issue. This argument is clearly contrary to both a plain reading of the statute as a whole and the established law in Ohio.</u> In a Third District felonious assault case, the appellant argued that he had an absolute right to forcibly remove a person who was unlawfully on his property without regard to whether he acted within the context of the established norms of self-defense. *State v. Hadley,* 3d Dist. No. 9–11–30, 2013–Ohio–1942. The Court explained:

> [U]nder Hadley's interpretation of the statute, the prosecution is precluded from ever rebutting the actual elements of self-defense with evidence that the defendant was not justified in using force or that the defendant used force unreasonably necessary and disproportionate to the apparent danger presented by the situation.

> This would mean that in every scenario in which the presumption of self-defense stated in R.C. 2901.05(B)(1) applies, the defendant is entitled to use any amount of force—even if it is unjustified or disproportionate to the apparent danger presented—against someone in his or her residence who is not privileged to be there regardless of the particular facts and circumstances of the situation. This produces an absolute license to commit any level of violence, including deadly force against any trespasser, immediately upon revoking their privilege to be there, and regardless of the circumstances. (Emphasis deleted.)

*Id.* at ¶ 58–59.

{¶ 21} The decision falls in line with decisions from other sister districts. See *State v. Montgomery*, 12th Dist. No. CA2015–03–028, 2015–Ohio–4652, 48 N.E.3d 1042, (the state can rebut the castle doctrine presumption by showing that the elements of traditional self-defense were not met); *State v. Petrone*, 5th Dist. No. 2011CA00067, 2012–Ohio–911 (recognizing that the state can rebut the castle doctrine by showing that the defendant was at fault in creating the situation or did not have a reasonable belief that he was in imminent danger of death or great bodily harm); *State v. Kozlosky,* 195 Ohio App.3d 343, 2011–Ohio–4814, 959 N.E.2d 1097 (8th Dist.) (the state failed to rebut the castle doctrine presumption where the

evidence showed that the defendant was not at fault in creating the situation and that he had a bona fide belief that he was in imminent danger of death or great bodily harm). So while the "castle doctrine" does appear to upend the usual burdens of proof, in that we start with the presumption a defendant acted in self-defense if the intruder is inside the defendant's home uninvited instead of requiring such a defendant to first prove all the elements of self-defense, this presumption does not negate those elements. Instead, the burden becomes the state's to show that the defendant's actions do not comport with the elements of self-defense. See *Montgomery*, *supra*, and *State v. Bundy*, 2012–Ohio–3934, 974 N.E.2d 139.

{¶ 22} It is apparent, then, that <u>Appellant's attempt to remove and utilize only one portion of the more extensive self-defense statute must fail. The statute as regards the "castle doctrine" is clearly part of the self-defense body of law, and while it provides a defendant confronted with an intruder into his or her residence with somewhat greater protections under the law, this doctrine does not serve as a stand alone right to use deadly force absent other elements of self-defense.</u> Because Appellant's assignments of error are based on his misplaced reliance on his interpretation of the doctrine's presumption, we will review these assignments accordingly.

*Carosiello*, 2017 WL 4548327, at *3-5; (ECF Doc. 7-1, pp. 100-04 (emphasis added)).

Mr. Carosiello does not directly repeat these arguments in the present Petition. Nevertheless, to the extent his "castle doctrine" arguments in Grounds Three and Four are intended to challenge the state court of appeals' findings, AEDPA deference applies and the undersigned finds the state court of appeals' findings are neither contrary to nor an unreasonable application of clearly established federal law.

With respect to the new arguments in Ground Three—that the "castle doctrine" in Ohio Revised Code § 2901.05(B) and the related jury instructions are unconstitutional because they permit the state to rebut the presumption of self-defense "by a preponderance of the evidence" rather than beyond a reasonable doubt—the undersigned finds Mr. Carosiello has not met his burden to support a grant of relief on the merits.

Mr. Carosiello acknowledges that the statutory scheme governing self-defense at the time of his trial established a presumption of self-defense when defensive force was used against a

person entering a residence unlawfully and without privilege to do so, but provided that the presumption "may be rebutted by a preponderance of the evidence." (ECF Doc. 17-1, p. 162 (quoting O.R.C. § 2901.05(B) (2015)).) However, he argues that the presumption created by the statute should be considered a "fact necessary" for conviction under *In Re Winship*, 397 U.S. 358 (1970), the Fourteenth Amendment right to due process, and the Sixth Amendment right to trial by jury, and that the state should therefore be required to rebut the presumption "beyond a reasonable doubt." (*Id.* at pp. 166-67, 176, 205-08.) In making this requested finding, Mr. Carosiello asks that his Court "not extend the Supreme Court ruling in Martin v. Ohio, 480 U.S. 228 to this radically different situation. (*Id.* at p. 208.)

In *Martin*, the Supreme Court found that the Fourteenth Amendment Due Process clause did not forbid Ohio from "placing the burden of proving self-defense on the defendant when . . . charged . . . with committing the crime of aggravated murder . . . defined as 'purposely, and with prior calculation and design, causing the death of another.'" 480 U.S. at 230. The defendant in *Martin*, like Mr. Carosiello, was charged with aggravated murder and was challenging the state's statutory framework for self-defense, which placed on a defendant the burden of proving self-defense. *Martin*, 480 U.S. 228. The Supreme Court found Ohio's "practice of requiring self-defense to be proved by the defendant" was not unconstitutional. *Id.* at p. 236. Here, Mr. Carosiello has not shown that Ohio's "castle doctrine" or statutory self-defense framework runs afoul of or is precluded by *Martin* or other clearly established federal law.

With respect to the new arguments in Ground Four—that Mr. Carosiello has a substantive right to "defense of home, family, and self, against an unlawful intruder, using a firearm" under the Second Amendment or the Privileges and Immunities clause of the Fourteenth Amendment, which requires the state to "prove absence of self-defense, defense of home, and defense of

another, beyond a reasonable doubt"—the undersigned also finds Mr. Carosiello has not met his burden to support relief on the merits.

Mr. Carosiello has not provided appropriate legal authority to establish the asserted substantive constitutional right.  As one district court explained when rejecting a petitioner's claim that his murder conviction "violate[d] the Second Amendment's guarantee of the right to keep and bear arms for self-defense":

> [T]he Supreme Court has never held that the Second Amendment justifies murder or conspiracy to commit murder, or that it creates a broader standard for self-defense then provided by state law. Petitioner fails to cite any case law for this proposition. "Like most rights, the Second Amendment right is not unlimited. It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."

*Sanders v. Rivard*, No. 4:12-cv-15122, 2014 WL 2931460, * 5 (E.D. Mich. June 30, 2014) (quoting *District of Columbia v. Heller*, 554 U.S. 570, (2008)).  More recently, another district court rejected a petitioner's claim that "the jury's verdict violated his Second Amendment right to defend himself" because he was attacked.  *Mitchell v. Brown*, No. 1:19-CV-993, 2022 WL 3593280, at * 10 (W.D. Mich. Aug. 23, 2022).  The court, relying on the analysis in *Sanders*, concluded:

> Petitioner fail[ed] to identify any Supreme Court precedent providing for a broader standard of self defense under state law.  Petitioner presented a self-defense theory at trial, and the trial court instructed the jury on the defense. Ultimately, the jury rejected the defense because it determined that the evidence did not support the defense, as it was entitled to do as the finder of fact.

*Id.* at * 11.

In this case, similarly, Mr. Carosiello had the right to assert self-defense as an affirmative defense under state law, and exercised that right.  The jury considered the entirety of the evidence, including his testimony offered in support of that defense.  The jury instructions in this case made clear that even if the State rebutted "the presumption of self-defense by a

72

preponderance of the evidence, . . . [t]he State still must prove to [the jury] beyond a reasonable doubt all the elements of the crime of aggravated murder."  (ECF Doc. 7-9, p. 125.)  Having considered the evidence presented, the jury concluded that the State had proven beyond a reasonable doubt his guilt as to aggravated murder.

The undersigned finds Mr. Carosiello has not shown that the state court of appeals' consideration of his "castle doctrine" claim was contrary to or an unreasonable application of clearly established federal law.  He also has not demonstrated a legal basis upon which this Court could appropriately use these proceedings to establish a constitutional substantive right to self-defense or find Ohio's statutory framework for self-defense unconstitutional.  Accordingly, to the extent the Court finds the claims in Grounds Three and Four of the Petition to be properly before this Court, the undersigned recommends that the Court **DENY** those claims on the merits.

## IV.    Recommendation

For the reasons explained above, the undersigned recommends that the Court **DENY** Grounds One and Two and **DISMISS** and/or **DENY** Grounds Three and Four with prejudice.


Dated: December 27, 2023                              _/s/ Amanda M. Knapp_
                                                                            AMANDA M. KNAPP
                                                                            UNITED STATES MAGISTRATE JUDGE



### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).